[Crim. No. 5758. In Bank. Feb. 3, 1956.]

THE PEOPLE, Respondent, v. GEORGE H. MARTIN, Appellant.

George H. Martin, in pro. per., and Clinton W. White, under appointment by the Supreme Court, for Appellant.

Edmund G. Brown, Attorney General, Clarence A. Linn, Assistant Attorney General, and Arlo E. Smith, Deputy Attorney General, for Respondent.

TRAYNOR, J.—Defendant appeals from a judgment of conviction entered on a jury verdict finding him guilty of one count of possessing marijuana in violation of Health and Safety Code, section 11500. He also appeals from an order that he claims was entered denying his motion for a new trial. The record, however, does not disclose that a motion for a new trial was made or that an order denying it was entered. The latter appeal must therefore be dismissed.

Officers McCann and Price of the Oakland Police Department were on automobile patrol duty during the evening of July 21, 1954. At about 11 o'clock, while driving in a southerly direction on Poplar Street near 21st Street, they observed a car parked on the opposite side of the street headed in the opposite direction. As they passed the car, Officer McCann turned his spotlight on it and saw two men sitting in the front seat. He testified: ". . . it is a lover's lane. If it had been a female and a male I wouldn't have thought too much of it but two males in that vicinity I figured we had better check it out and as I brought the patrol car around to make a U-turn on Poplar Street the suspects' car took off. They spun their wheels taking off at a high rate of speed. They turned right onto 21st Street and proceeded up 21st Street and turned right again on Union Street which would put them heading in a southern direction again on Union Street and they turned east on 19th Street and all this time I had the red light and siren on and I brought the patrol car on up there on their left rear and very close and stopped them in front of 1181 - 19th Street." Officer McCann approached the car from the left, and Officer Price from the right, and one of them flashed his flashlight into the car. Robert Dial, who later pleaded guilty to the charge of possession of marijuana, was in the driver's seat. Defendant was sitting on the right-hand side of the front seat. Dial's right hand and defendant's left hand were on the center of the seat. The officers ordered the suspects to put their hands in front of them, and when they did so Officer McCann saw a small bag in the middle of the front seat that had been covered by their hands. The officers ordered the suspects

out of the car, and after searching them for weapons Officer McCann reached into the car and took the bag. He examined it and concluded that it contained marijuana. Later analysis confirmed this conclusion.

Defendant contends that the search of the automobile without a warrant was unlawful and that the evidence produced thereby was therefore inadmissible.

■ Although the presence of two men in a parked automobile on a lover's lane at night was itself reasonable cause for police investigation (see *People* v. *Simon,* 45 Cal.2d 645, 649-651 [290 P.2d 531]; *Gisske* v. *Sanders,* 9 Cal.App. 13, 16-17 [98 P. 43]), their sudden flight from the officers and the inference that could reasonably be drawn therefrom that they were guilty of some crime (*United States* v. *Heitner,* 149 F.2d 105, 107), left no doubt not only as to the reasonableness but as to the necessity for an investigation. (*Husty* v. *United States,* 282 U.S. 694, 700-701 [51 S.Ct. 240, 75 L.Ed. 629, 74 A.L.R. 1407]; *Talley* v. *United States,* 159 F.2d 703; *Levine* v. *United States,* 138 F.2d 627, 628-629; *Jones* v. *United States,* 131 F.2d 539, 541.) Under these circumstances the officers were justified in taking precautionary measures to assure their own safety on overtaking the suspects, and it was therefore reasonable for them to order the suspects to put their hands in front of them and to get out of the automobile to be searched for weapons before being questioned. ■ When Officer McCann saw the bag that was uncovered when the suspects removed their hands, he had reasonable cause to believe that their possession of it prompted the flight and that it contained contraband. He was therefore justified in taking it from the automobile. (*Carrol* v. *United States,* 267 U.S. 132, 149 [45 S.Ct. 280, 69 L.Ed. 543, 39 A.L.R. 790]; *Husty* v. *United States, supra,* 282 U.S. 694, 700-701; *Scher* v. *United States,* 305 U.S. 251, 255 [59 S.Ct. 174, 83 L.Ed. 151]; *Brinegar* v. *United States,* 338 U.S. 160, 165-171 [69 S.Ct. 1302, 93 L.Ed. 1879]; *United States* v. *One 1946 Plymouth Sedan Automobile,* 167 F.2d 3, 7.)

The judgment is affirmed, and the appeal from an alleged order denying a motion for new trial is dismissed.

Gibson, C. J., Shenk, J., Schauer, J., Spence, J., and McComb, J., concurred.

CARTER, J.—I dissent.

It appears to me that the following statement from the majority opinion is most astounding: ''Although the pres-

ence of two men in a parked automobile on a lover's lane at night was itself reasonable cause for police investigation. . . .'' There are so many perfectly legitimate reasons why the car might have been parked with two men as passengers and so many logical explanations therefor, that to say the very sight of two men in a parked automobile at night warrants a police investigation reminds one of the Gestapo. Since when has there been a curfew for adults? Since when has it been illegal for two men to converse at night in a parked automobile? Since the deplorable practice of ''bugging'' hotel rooms, private homes and offices and tapping telephone lines has become so prevalent, almost the only place two businessmen, who wish their conversation to remain private, can be safe is in an automobile on a sparsely traveled street or other secluded place. And, if their mere presence in a parked automobile is held to warrant police investigation, it appears that private conversations must also be held illegal and the right of privacy nonexistent.

It must be remembered that the Fourth Amendment to the Constitution of the United States was adopted for the protection of all of the people of this country, and that section 19 of article I of the Constitution of California was adopted for the protection of all of the people of this state. The object and purpose of the framers of these constitutional mandates was to guarantee and make secure the fundamental right of privacy to every person—the right to be secure against police surveillance unless the police have reasonable cause to believe that an offense is being committed. This does not mean mere suspicion as some of our courts have recently indicated. The obvious reason for the rule that evidence obtained as the result of an illegal search, cannot be used against the victim of the search, is to protect innocent people by discouraging such searches. It is a matter of common knowledge that it has been the practice of law enforcement officers of this state to make searches of the persons and property of individuals whenever they saw fit regardless of whether reasonable or any cause existed, and many innocent people have been subjected to the indignity and humiliation of having their persons, homes, offices and automobiles searched by law enforcement officers with impunity when nothing of an incriminating nature was found and no arrests or prosecutions resulted therefrom. Many of these invasions of the constitutional right of privacy received no public mention because the victims did not wish to incur the expense

and endure the inconvenience and publicity incidental to seeking redress in the courts. It is probable that for every case where evidence of a crime has been found there have been numerous illegal searches which uncovered no evidence whatsover, and we know from the reported cases that the practice of illegal searches in this state has increased many fold in recent years. The American way of life does not lend itself to such totalitarian practices. There is no place in our body politic for the Gestapo, the storm trooper or the commissar. Ours is a system of ordered liberty which is made more secure by placing a magistrate between the citizens and the overzealous law enforcement officer. While this system must protect the guilty as well as the innocent against an unlawful search and seizure, its effect on criminal prosecutions in this field is no different than any of the other safeguards embraced in the Bill of Rights which are designed to protect the life, liberty and property of our people against deprivation without due process of law. Each and every one of these safeguards operates as an impediment against the conviction of the guilty as well as the innocent. Yet, this is necessary in any system of ordered liberty. If the above mentioned constitutional provisions have any meaning whatsoever, then the victim of an illegal search may assert the right of privacy guaranteed to him and resist such search. If he does so, either he or the officer may be injured or killed. If this should occur, where should the blame fall? Obviously, a prosecutor who favors such illegal conduct on the part of law enforcement officers would be disposed to prosecute the victim of the illegal search if he should injure or kill the officer in his effort to resist the search, and would not prosecute the officer who injured or killed the victim in the forcible execution of his illegal project.

From the intemperate and misleading statements appearing in the public press recently as having been made by heads of police departments and prosecuting officers of this state against the rule in the Cahan case, we are forced to assume that they feel that great credit and high praise should go to those law enforcing officers who ruthlessly violate the above mentioned constitutional guarantees, and that hatred, contempt, ridicule and obloquy should be heaped upon those who insist upon their observance and preservation. I will again repeat what I have said many times both as a private citizen and as a public official of this state, that I have a sincere devotion to the American system for the administration of justice as postulated by the Constitution of the United

States and the Bill of Rights; that I can conceive of no emergency short of a threat to our national security which would justify striking down any of the safeguards for the protection of the rights of the people embraced within that system. The impediments against law enforcement, the escape of some criminals from conviction and punishment, and the cost to the public incidental to the operation of such a system, fades into insignificance when we offset and balance against those factors the glorious feeling which stems from the consciousness that, because of this system, we live in an atmosphere where we may enjoy life, liberty and the pursuit of happiness with dignity and self-respect, secure against any invasion of our fundamental personal rights without due process of law.

The elder Pitt, in his speech on the Excise Tax, gave expression to what later became the Fourth Amendment. What he said then is just as important today. He said that ''The poorest man may in his cottage bid defiance to all the forces of the crown. It may be frail; its roof may shake; the winds may blow through it; the storms may enter; the rain may enter—but the King of England cannot enter. All his forces cannot cross the threshold of the ruined tenement.'' Yet, prior to the decision in the Cahan case, the police and other so-called law enforcement officers in California could ruthlessly force their way into the home of a private citizen, and *without a search warrant,* seize whatever they found and use it as evidence in our courts notwithstanding they violated the constitutional right—the right of privacy—of the citizen in obtaining it.

Another great Englishman, Lord Coke, had this to say on this same subject: ''The house of everyone is to him as his castle and fortress, as well for his defense against injury and violence as for his repose.''

Mr. Justice Holmes, in his great dissent in *Olmstead* v. *United States,* 277 U.S. 438, 469, 470 [48 S.Ct. 564, 72 L.Ed. 944, 66 A.L.R. 376], had this to say: ''But I think, as Mr. Justice Brandeis says, that apart from the Constitution the government ought not to use evidence obtained and only obtainable by a criminal act. . . . [W]e must consider the two objects of desire, both of which we cannot have and make up our minds which to choose. It is desirable that criminals should be detected, and to that end that all available evidence should be used. It also is desirable that the government should not itself foster and pay for other crimes, when they

are the means by which the evidence is to be obtained. If it pays its officers for having got evidence by crime I do not see why it may not as well pay them for getting it in the same way, and I can attach no importance to protestations of disapproval if it knowingly accepts and pays and announces that in future it will pay for the fruits. *We have to choose, and for my part I think it a less evil that some criminals should escape than that the government should play an ignoble part."* (Emphasis added.)

I am in full accord with the views expressed by Mr. Justice Traynor, in *People* v. *Simon*, 45 Cal.2d 645, 650 [290 P.2d 531], where he said: "In the present case the officer searched first and asked questions only after his search uncovered the incriminating cigarette, and there is nothing to indicate that had he confined himself to a reasonable inquiry, he would have discovered anything to confirm his suspicion that defendant had no lawful right to be where he was.

"Under these circumstances, to permit an officer to justify a search on the ground that he 'didn't feel' that a person on the street at night had any lawful business there would expose anyone to having his person searched by any suspicious officer no matter how unfounded the suspicions were. *Innocent people, going to or from evening jobs or entertainment, or walking for exercise or enjoyment, would suffer along* with the occasional criminal who would be turned up. As pointed out by Mr. Justice Jackson in a similar case, 'We meet in this case, as in many, the appeal to necessity. It is said that if such arrests and searches cannot be made, law enforcement will be more difficult and uncertain. But the forefathers, after consulting the lessons of history, designed our Constitution to place obstacles in the way of a too permeating police surveillance, which they seemed to think was a greater danger to a free people than the escape of some criminals from punishment. Taking the law as it has been given to us, this arrest and search were beyond the lawful authority of those who executed them.' (*United States* v. *Di Re, supra,* 332 U.S. 581, 595 [68 S.Ct. 222, 92 L.Ed. 210].)" (Emphasis added.) In *Gisske* v. *Sanders,* 9 Cal.App. 13, 16, 17 [98 P. 43], the court said: "A police officer has a right to make inquiry in a *proper manner* of anyone upon the public streets at a late hour as to his identity and the occasion of his presence, *if the surroundings are such as to indicate to a reasonable man that the public safety demands such identification.* The fact that crimes had recently been committed in that neigh-

borhood; that plaintiff at a late hour was found in the locality; that he refused to answer proper questions establishing his identity, were circumstances which should lead a reasonable officer to require his presence at the station, where the sergeant in charge might make more minute and careful inquiry." (Emphasis added.) Here, even after the chase, the suspects were not questioned—they were *ordered* to put their hands in front of them, and *ordered* to get out of the car.

To bolster its theory that the very sight of the two men in a parked car justified a police investigation, the majority relies on their flight from the officers. In *United States* v. *Heitner*, 149 F.2d 105, 106, the officers involved had been ordered by police headquarters to watch a certain building where it was suspected a still was being operated. Two men came out of the building and were followed by the officers who lost them. They went back to the building and the chase, or flight, ensued when the two men returned there. It is obvious from a reading of the case that the facts there showed more than the presence of two men in a car to warrant the search. In *Husty* v. *United States*, 282 U.S. 694, 700 [51 S.Ct. 240, 75 L.Ed. 629, 74 A.L.R. 1407], the facts showed that on the day of petitioner's arrest, the officer had received information that Husty had two loads of liquor in certain described automobiles which were parked in "particular places on named streets." The court held that the information received prior to the arrest was sufficient to show probable cause for the arrest. In the instant case, we have only the fact that two men were parked in an automobile at night and their flight from the investigating officers to establish probable cause. In *Talley* v. *United States*, 159 F.2d 703, the court noted that "there was advance information sufficient in itself to justify the search. But, more than that, there was actual evidence of conduct, including flight, transpiring in the presence of the officers" to justify their search. In *Levine* v. *United States*, 138 F.2d 627, there was also advance, reliable information that the appellant had illegal possession of alcohol prior to the search by the officers. In *Jones* v. *United States*, 131 F.2d 539, probable cause for the search was found to exist because the officers had kept the accused premises under surveillance for about three months prior thereto.

From the summary set forth above of the cases relied on by the majority it appears that they are readily distinguishable. In all of them there was advance information that

a crime was being committed together with flight from law enforcement officers. In the instant case there was only the sight of two men in a parked car and their flight after the police started their investigation. In *People* v. *Brown*, 45 Cal.2d 640 [290 P.2d 528], we held that a search incident to an arrest could not be justified in the absence of reasonable cause under section 836 of the Penal Code merely because it revealed that defendant was in fact guilty of a felony. (*People* v. *Simon*, 45 Cal.2d 645, 648 [290. P.2d 531].) There was, therefore, under the facts here present no reasonable cause to justify the search and the evidence was inadmissible. (*People* v. *Cahan*, 44 Cal.2d 434 [282 P.2d 905].)

I would therefore reverse the judgment.