[Crim. No. 5650. Second Dist., Div. One. Oct. 29, 1956.]

THE PEOPLE, Respondent, v. MANUEL LEE GUY, Appellant.

Matthews & Hill and John J. Hamilton for Appellant.

Edmund G. Brown, Attorney General, and Robert S. Rose, Deputy Attorney General, for Respondent.

WHITE, P. J.—In an information filed by the District Attorney of Los Angeles County, defendant was accused of a violation of section 11500 of the Health and Safety Code in that on or about July 5, 1955, she unlawfully had in her possession a preparation of heroin. Defendant entered a plea of not guilty, a trial by jury was duly waived and, pursuant to stipulation, the People's case was submitted on the transcript of the testimony adduced at the preliminary examination, both sides reserving the right to offer additional evidence. When the cause was called for trial the court announced that he observed in the preliminary examination transcript that "there was a motion made to suppress the evidence here," and inquired of defendant's counsel whether he intended to "object to the evidence or make a motion to suppress it." Upon receiving an affirmative reply, the court stated, "All right. Before I rule on that motion, I will hear this testimony." Officer Gutierrez then testified concerning the arrest of defendant. Defendant's motion to suppress the evidence was denied, and following testimony offered on behalf of defendant, the court adjudged her guilty as charged and sentenced her to imprisonment in the California Institute

for Women for the term prescribed by law. Defendant filed notice of appeal ''From the decision and judgment . . . and from the order of sentence . . .''.

We regard the following as a fair epitome of the factual background surrounding this prosecution. On behalf of the People, Officer Gutierrez, attached to the narcotic detail of the Los Angeles County sheriff's office, testified that on July 5, 1955, at about 1:30 p. m., he received information that defendant was in possession of a quantity of narcotics. He had received similar information concerning the defendant on several previous occasions. The gist of ''the information was to the effect that the defendant was involved in the trafficking of narcotics, that she was a source of supply.'' He was also informed of the defendant's name and address. That he also received information concerning a male companion of the defendant. This information was to the effect that ''he was involved in the sale of narcotics also in combination with the defendant.'' Gutierrez had also received previous information concerning the defendant's male companion.

At approximately 2:30 p. m. on July 5, Officer Gutierrez, in company with Officers Ruskin, Fletcher and Stameison, drove to the defendant's residence at 12206 Alvera Street, Los Angeles.

Upon arriving at the defendant's residence Deputy Ruskin walked to the rear of the abode and Officer Gutierrez went to the front door. On receiving no response, Gutierrez walked along the side of the driveway and through an open gate into the back yard. The defendant's male companion, Mr. Matistick, was painting the garage. The defendant was reclining on a lawn swing, approximately 30 feet away. The officers first arrested Matistick, who was known to Officer Gutierrez. The latter then approached the defendant and informed her that she was under arrest on a narcotics charge. She requested that they enter the house because she was quite upset and had to go to the bathroom. At that time Officer Gutierrez, Deputy Ruskin and the defendant entered the house. Gutierrez told the defendant that a matron was enroute and that she would have to wait for the matron to arrive before she could enter the bathroom. He then asked the defendant ''if it was all right to search her bedroom and she stated it was all right, and we proceeded to search the bedroom.''

A search of the bedroom was effected in the presence of the defendant and revealed a green bottle containing 47

capsules which contained a brownish powder. The capsules were subsequently analyzed by Martin Klein, a chemist of the sheriff's crime laboratory. In Klein's opinion, the powdery substance contained heroin.

Officer Gutierrez further testified that he displayed the green bottle containing the 47 capsules to the defendant, who stated that the capsules were hers; "that she had purchased them approximately four days prior to her arrest; that she had purchased at that time five grams; that this was the remainder of the five grams that she had purchased; that she purchased them for her own personal use." She also stated that her male companion, Mr. Matistick, "knew nothing about the narcotics and that they were only for her use." Gutierrez then looked at the defendant's arms. He observed 13 puncture wounds along the radial vein of the left arm. He also observed eight puncture wounds along the radial vein of the right arm.

As a witness in her own behalf defendant testified that she was the owner and occupant of the premises at 12206 Alvera Street, in the city of Los Angeles. In answer to a question to "describe the premises as to whether or not it was enclosed on that day," defendant testified "There is a fence around the back starting from the kitchen wall. There is a fence starting from the driveway side about six and a half feet that continues back to the end of the lot. My lot is 150 by 50 or 50 by 150, something like that. It is deeper than it is wide." That "There is a fence across the driveway which takes in all the back yard and clear around to the other side . . . the back yard is enclosed . . . The front yard is not enclosed; a portion of the driveway is enclosed. The back yard is enclosed . . . The gate is attached to the house." As to the immediate circumstances surrounding her arrest defendant testified as follows: "Around 2:30, about that time, I was lying in the swing in the back yard and Stanley was painting the garage with his back to the gate, and all of a sudden an officer—not this officer that testified— another officer ran up the drive. "When I knew anything, he was running up the gate, up the fence, and landed down on his feet. He jumps up with a pistol in his hand and his badge and he says, 'Stanley, you are under arrest.'

"At that moment he hollered for help and this officer shows up. He tries to make the fence, the gate once, but he can't, so he goes back down again. He puts a pistol through the fence and he says to me, 'You over there, don't move.'

"Then he comes over the fence with another try. Another officer—there were four of them—another officer points his gun through the gate and says to me, 'Don't move over there.' while he is making himself come over, you know, while he is coming over there.

"Then the first officer that came over takes the piece of iron that closes the gate down like this, the two gates. There are two gates there and they close by a piece of iron and a chain and a lock. He takes the pistol and breaks the little lock, which doesn't take very much. We only had it there because we had a dog and we tried to keep him in the back yard because he knows nothing about cars. So he breaks the lock and lets the third officer in.

"The third officer goes through my back door and the fourth officer the front door. This officer says to me, 'You are under arrest.'

"And I said, 'How can you fellows break in my property without a warrant?'

"The first officer said, 'We don't need a warrant.' Then he says, 'Come on, let's go in the house.'

"He started searching my robe and I said, 'I have nothing on but the robe and you can't search me.'

"So he continues to go in my pockets anyway. Then noticing that I didn't have anything in the robe by pulling the robe apart, he said, 'Let's go in the house.'

"In the meantime the first officer had handcuffed the male fellow who was there. He brought him in behind me. I went in at this officer's request with a pistol, and then Stanley came in behind me.

"In the meantime, my mother was there. My mother had come to the back because she heard the racket. My mother was there already. She had been there the night before.

"So we all got inside. Then I asked to go to the bathroom because I had had dysentery for two years. He says to me, 'You can't go to the bathroom.'

"I says, 'You can't search me.'

"I asked again and I asked the first officer that came in, who is a little younger man, 'What about your warrant?'

"He says, 'We don't need one.' "

. . . . . . . . . . . . . .

"Q. Did the officer use any physical force at all? A. My arms. He took hold of my arms and the other officer handcuffed Stanley and brought him in handcuffed. This officer

held onto my arms. Then he sent someone out to call the lady. The lady was not on arrival. I didn't have a phone. They sent someone to call the lady, and in the meantime they held me prisoner in my bedroom.

"Q. Did you have a gun on you all this time? A. There was one man that stood in the room while the rest of them gone by themselves, you know, about the house, and he had a gun on his person, yes.

"Q. Did you ever tell the officers to go ahead and search the house, the room? A. No, I didn't. They said they were going to search it and they started with my bedroom and took me and Stanley into the bedroom.

"Q. Did you have any fear of the officers or the use of violence when you were taken into the house by the officers? A. I sure did. That was my first time to ever be pushed around by them.

"Q. Did you ever say, 'I give you permission to enter the house,' or words to that effect? A. I never asked him to come in; he told me I had to go in."

Mrs. Florence Thomas, mother of defendant, testified that she was sleeping on the premises, was awakened by "the noise, hollering." That "I saw an officer in the kitchen, the first thing I saw. I made for the back and they had this male character, searching him, I think, and then the next thing I remember seeing was the officer with my daughter coming into the house. That is all I know."

In urging a reversal appellant first contends that the search of her bedroom and the seizure of the forty-seven capsules of heroin were unlawful and that the court erred in refusing to grant her motion to suppress the allegedly illegally obtained evidence, obtained, it is asserted, by an unwarranted and illegal search of appellant's premises. The latter argues that the arresting officers effected the search without a valid warrant of arrest and without probable cause.

Penal Code, section 836, provides in part, as follows: "A peace officer may make an arrest in obedience to a warrant delivered to him, or may, without a warrant, arrest a person:

. . . . . . . . . . . . . .

"3. When a felony has in fact been committed, and he had reasonable cause for believing the person arrested to have committed it . . ."

That reasonable cause to justify an arrest may consist of information obtained from others, and is not limited to evidence that would necessarily be admitted at the trial on

the issue of guilt is now well settled (*Trowbridge* v. *Superior Court*, 144 Cal.App.2d 13, 17 [300 P.2d 222], and cases therein cited).

■ "The term, reasonable or probable cause, has been defined: 'By "reasonable or probable cause" is meant such a state of facts as would lead a man of ordinary caution or prudence to believe, and conscientiously entertain a strong suspicion, that the person accused is guilty.' (*In re McCarty*, 140 Cal.App. 473, 474 [35 P.2d 568].)

■ "The term, probable, has been defined as meaning 'having more evidence for than against; supported by evidence which inclines the mind to believe, but leaves some room for doubt.' (*Ex parte Heacock*, 8 Cal.App. 420, 421 [97 P. 77].)" (*People* v. *Novell*, 54 Cal.App.2d 621, 623-624 [129 P.2d 453].)

With the foregoing rules in mind we find that the record discloses that Officer Gutierrez, approximately two weeks prior to the arrest, received information to the effect that the appellant was involved in the trafficking of narcotics, "that she was a source of supply." From the time of receiving this information until the time of the arrest, Gutierrez had received similar information concerning the appellant on several occasions. Gutierrez had also received information that the appellant's male companion was "involved in the sale of narcotics . . . in combination with the defendant." Three or four days prior to the arrest Gutierrez had received information "to the effect that the defendant as well as another person (Mr. Matistick) was a source of supply, that either one of the two could arrange a sale of narcotics." The information concerning the appellant also included her name and address.

Approximately one hour prior to the arrest of the appellant and her male companion (Mr. Matistick), Gutierrez received information from a confidential informant that the appellant at that time was in possession of a quantity of narcotics. The confidential informant told Officer Gutierrez "that she would have it in her possession or that it would be in her bedroom." It is also in evidence that the purpose of going to appellant's residence was to arrest her and her male companion. Upon entering the premises, appellant's companion, Mr. Matistick, was placed under arrest. Officer Gutierrez then walked some 30 feet to where appellant was reclining in a lawn swing and informed her she was "under arrest on a charge of narcotics."

While the record discloses that the officers did not have a search warrant, it is, however, silent as to whether or not the

officers were possessed of a valid warrant for the arrest of appellant. The burden rests upon an accused to raise the question of the legality of the search and seizure in the trial court. This he may do by establishing (1) that the arrest was made without a warrant, or (2) that private premises were entered or a search thereof made without a search warrant. As to the latter question, appellant met the issue by establishing the fact that the officers did not have a search warrant. However, as to the first question there was no showing whatever. In *Badillo* v. *Superior Court,* 46 Cal.2d 269, 272 [294 P.2d 23], our Supreme Court said, "the defendant makes a prima facie case when he establishes that an arrest was made without a warrant or that private premises were entered or a search made without a search warrant, and the burden then rests on the prosecution to show proper justification (citations)." In the case at bar, as in the case of *People* v. *Farrara,* 46 Cal.2d 265 [294 P.2d 21], there is no such evidence concerning the possession of a warrant of arrest by the officers and, as stated in the case just cited, at page 268, ". . . to reverse the judgment it would be necessary to presume that the officers acted illegally and that the trial court erred in admitting the evidence so obtained. It is settled, however, that error will not be presumed on appeal (*Vaughn* v. *Jonas,* 31 Cal.2d 586, 601 [191 P.2d 432] ; *People* v. *Gutierrez,* 35 Cal.2d 721, 727 [221 P.2d 22] ; *Lynch* v. *Birdwell,* 44 Cal.2d 839, 846-847 [285 P.2d 919] ; *People* v. *McManis,* 122 Cal.App.2d 891, 899 [266 P.2d 134]), and in the absence of evidence to the contrary it must also be presumed that the officers regularly and lawfully performed their duties. (Code Civ. Proc., § 1963 subds. 1, 15, 33; *People* v. *Serrano,* 123 Cal.App. 339, 341 [11 P.2d 81] ; see also *Vaughn* v. *Jonas, supra,* 31 Cal.2d 586, 601.) "

Appellant earnestly contends that "no attempt was made to show the reliability, if such there was, which should be attached to the hearsay testimony of the informant."

 We are satisfied that while this might go to the weight to be given the testimony it does not entirely destroy the evidentiary value thereof when it is remembered that the information received by the officers was not mere surmise or a bare suspicion that appellant possessed narcotics The information was that appellant would have the contraband on her person or in her bedroom and the informant also supplied the officers with the name of appellant and her address. Furthermore, no

inquiry was made at the trial by appellant in cross-examination of the officer as to the "reliability" of his informant.

Since the recurring questions of the reasonableness of the officer's conclusion that a felony had been committed and the belief upon his part that appellant had committed it must find resolution in the facts and circumstances of each case, we are persuaded that, if it be conceded, in the case now engaging our attention, that the officers did not have a warrant of arrest, nevertheless, they were justified, under the facts herein narrated, in taking appellant into custody. Therefore, the search was lawful, contemporaneous with and incident to the lawful arrest.

As was said in *United States* v. *Rabinowitz,* 339 U.S. 56 [70 S.Ct. 430, 94 L.Ed. 653, 657-660] :

"It is unreasonable searches that are prohibited by the Fourth Amendment. *Carroll* v. *United States*, 267 U.S. 132, 147 [45 S.Ct. 280, 69 L.Ed. 543, 39 A.L.R. 790] . . . It was recognized by the framers of the Constitution that there were reasonable searches for which no warrant was required. The right of the 'people to be secure in their persons' was certainly of as much concern to the framers of the Constitution as the property of the person. Yet no one questions the right, without a search warrant, to search the person after a valid search. The right to search the person incident to arrest always has been recognized in this country and in England. *Weeks* v. *United States,* 232 U.S. 383, 392 [34 S.Ct. 341, 58 L.Ed. 652, L.R.A. 1915B 834] . . . Where one had been placed in the custody of the law by valid action of officers, it was not unreasonable to search him.

" . . . . . . . . . . . . .

"Decisions of this Court have often recognized that there is a permissible area of search beyond the person proper. Thus in *Agnello* v. *United States,* 269 U.S. 20, 30 [46 S.Ct. 4, 70 L.Ed. 145, 51 A.L.R. 409] . . . this Court stated:

" 'The right without a search warrant contemporaneously to search persons lawfully arrested while committing crime and to search the place where the arrest is made in order to find and seize things connected with the crime as its fruits or as the means by which it was committed, as well as weapons and other things to effect an escape from custody, is not to be doubted.'

"The right 'to search the place where the arrest is made in order to find and seize things connected with the crime as

its fruits or as the means by which it was committed' seems to have stemmed not only from the acknowledged authority to search the person, but also from the longstanding practice of searching for other proofs of guilt within the control of the accused found upon arrest. *Weeks* v. *United States,* 232 U.S. 383, 392 [34 S.Ct. 341, 58 L.Ed. 652, L.R.A. 1915B 834]. . . . It became accepted that the premises where the arrest was made, which premises were under the control of the person arrested and where the crime was being committed, were subject to search without a search warrant. Such a search was not 'unreasonable.' (Citing cases.)'' (See also *People* v. *Winston,* 46 Cal.2d 151, 163 [293 P.2d 40]; *People* v. *Dixon,* 46 Cal.2d 456, 458, 459 [296 P.2d 557]; *United States* v. *Pisano,* 193 F.2d 361, 363.)

When, as in the instant case, the officer's belief of appellant's guilt is based on reasonable cause, and a felony has in fact been committed, not only are the requirements of subdivision 3 of Penal Code, section 836, satisfied, but a search incident to an arrest thereunder is reasonable.

Although we have concluded that under the facts of this case the consent of appellant to the search was not necessary, there is present the issue of whether the search of appellant's bedroom was with her consent. Officer Gutierrez testified that he "asked her (appellant )if it was all right to search her bedroom and she stated it was all right, and we proceeded to search the bedroom." As a witness in her own behalf, appellant denied that she gave permission for the search. This created a conflict in the evidence, which was for the trial court in the first instance, to resolve (*People* v. *Gorg,* 45 Cal.2d 776, 782 [291 P.2d 469]). While it may be said that it is doubtful whether the People sustained their burden of proving that appellant freely consented to the search of her bedroom, we cannot hold as a matter of law that the trial judge, under the circumstances here present abused the discretion vested in him in holding that the search was not in response to an unlawful assertion of authority but was undertaken pursuant to appellant's consent and therefore, was not unreasonable. However, as stated above, in the instant case, that issue was not crucial. For the reasons advanced above, it must be held that appellant's second and third contentions that the decision and judgment of the court are contrary to law and contrary to the evidence cannot be sustained.

Finally, appellant urges that the court admitted testimony

of unrelated matters and considered such matters, resulting in the violation of appellant's substantive rights. Claimed prejudice on the part of the trial court is premised upon statements made by the court when sentence was pronounced. In that regard the record reflects the following:

"THE COURT: I am not inclined to place this defendant on probation. I think she is trafficking in heroin. Anybody who has 47 capsules of heroin, has them for some purpose other than her own. There isn't any question about that . . .

"I don't listen to any explanations of people that sell heroin . . . I am satisfied, however, that she was selling it. . . . There is no necessity to sell heroin so far as this Court is concerned."

Appellant argues that the foregoing expressions by the court were based on what she characterizes as the "hearsay" testimony of Officer Gutierrez who related the information relayed to him by his informant that appellant was "a source of supply" and was "trafficking in narcotics."

It is argued that "Such hearsay testimony . . . should be . . . judged with extreme scrutiny, as it appears to be a matter of common knowledge that the stool pigeon very often is a nefarious and reprehensible character. . . ." Appellant's contention lacks substance here. In the first place, no objection was made to the foregoing testimony of the officer when the same was offered. It is well settled that objections not presented at the trial cannot be raised for the first time on appeal (*People* v. *Rocha*, 130 Cal.App.2d 656, 663 [279 P.2d 836]). Secondly, the challenged statements referred to were not offered in evidence to prove the truth of the matter asserted, but solely to establish that the officer had reasonable or probable cause to make the arrest and consequent search and seizure. The truth of the information given to Officer Gutierrez was not in issue, nor was it offered to prove any element of the offense charged against appellant. Viewed in the light of the limited purposes for which the statements in question were admitted in evidence, the hearsay rule does not apply (*People* v. *King*, 140 Cal.App.2d 1, 4, 5 [294 P.2d 972]). And lastly, the statements made by the court were not uttered during the trial nor at the time the court rendered its decision finding appellant guilty. The remarks were made after the finding of guilt and when the court was considering appellant's application for probation and had before it the report of the probation officer, the contents of which are not before us. From a reading of the statements

made by the court it is at once apparent that they were prompted by testimony that appellant had in her possession 47 capsules of heroin from which the trial judge concluded, as he said, that ''she has them for some purpose other than her own.''

The attempted appeal from the sentence is dismissed (*People* v. *Millum*, 42 Cal.2d 524, 525 [267 P.2d 1039]). The judgment is affirmed.

Doran, J., and Fourt, J., concurred.