[Crim. No. 5765. Second Dist., Div. Two. Feb. 4, 1957.]

THE PEOPLE, Respondent, v. JAMES STANLEY GARNETT, Appellant.

Rafter & Fredricks for Appellant.

Edmund G. Brown, Attorney General, and Elizabeth Miller, Deputy Attorney General, for Respondent.

MOORE, P. J.—Appellant was convicted on four counts of violating section 11500 of the Health and Safety Code, to wit, possession of opium and some of its numerous derivatives* on or about May 20, 1956. Also, he was convicted of burglary for having entered the Guild Drug Store with intent to commit theft on May 19, 1956. The matter was submitted on the pre-

---

*Isonipecaine, amidone, morphine sulphate, pantapon, dihydrocodeinone, dilaudid hydrochloride, codeine and papaverine, dolophine hydrochloride, papaverine.

liminary transcript and the exhibits received in evidence before the municipal court. The burglary was determined to be of the second degree. Appellant was found to be a narcotic addict, hence, the court having made the prison terms run concurrently, recommended his treatment at the Facility of Vacaville.

Appellant seeks to effect a reversal of the judgment on the ground that his home was illegally searched.

Pharmacist George Guild closed his store at Hermosa Beach at 10 p.m. on May 19, 1956. When he opened up the following morning, he found narcotics scattered over the floor, and that such drugs and money had been removed. Soon after the crime had been reported to the police, Officer Palmer was told by a reliable informant that there was supposed to be a quantity of narcotics in appellant's room 203 in a local hotel. Because the informant had been found to be reliable for a period of over three years and because the officer knew appellant and that he occupied room 203 in the specified hotel, he followed the reputed addict to the hostelry and straightway knocked at appellant's door. When his alarm brought no response, he procured the passkey from the landlady and knocked again before entering the room. At this juncture, one Thurston appeared, followed by appellant who suddenly dashed down the hall. He returned, however, on the order of the officer who demanded converse. Appellant protested that he had done nothing and told his official guest to ''go ahead and look around.'' As a suitcase was laid upon the bed, appellant exclaimed: ''I didn't put that in there. Somebody planted something on me. I don't know what is in there. . . . I didn't put it in there. Somebody planted it on me.''

When Officer Palmer found the valise contained 25 bottles, he placed appellant under arrest and passed the evidence to Deputy Sheriff Hatfield at 2 p.m. May 20 in the office of the Chief of Police of Hermosa Beach, appellant repeated that he had no knowledge of how the bottles got into his suitcase and insisted that someone must have planted them and asserted his readiness to account for his time during the preceding evening and the morning of the twentieth. However, when invited to do so, he maintained silence, whereupon the officers accompanied him back to room 203.

On entering, Deputy Hatfield asked appellant whether they might search the place. The only response was: ''You are the boss.'' Taking those words as an affirmative reply, the search began. A black box was found in the pocket of a coat

in the closet. In the box was an eye dropper, a burnt spoon, a plastic case with two hypodermic needles and a small plastic-top box containing a number of white tablets. Hatfield sealed the suitcase containing the black box and 25 bottles and other movables, delivered it to the sheriff's crime laboratory on the following day. Chemist Cromp examined its contents and found the contents of 18 of the 25 bottles were nine derivatives of opium. The tablets in the black box were found to be morphine sulphate.

Mr. Guild had not authorized the entrance into his store or the removal of the merchandise.

■ There was no proof that the search of room 203 was illegal or unreasonable. Even though Officer Palmer had no warrant, the arrest was lawful. The officer's first information relative to appellant as a suspect came from an informant who, during the preceding three or four years, at different times had correctly reported violations of the law and had thereby gained the confidence of the officer. He stated to Palmer: "There is supposed to be a bunch of narcotics in Garnett's room in 203." By reason of the previous relationship of Palmer and such informant, it was a reasonable inference for him to deduce that the latter intended to indicate that there was in fact a generous supply of contraband narcotics in room 203. Such facts so reported were reasonably sufficient to warrant Officer Palmer's search of room 203. (*People* v. *Guy,* 145 Cal.App.2d 481, 488-489 [302 P.2d 657] ; *Trowbridge* v. *Superior Court,* 144 Cal.App.2d 13, 17 [300 P.2d 222].) ■ But the officer was not obliged solely to rely upon the report of such informant as the basis for the arrest of appellant or for a search of his room. When appellant first saw the officer in room 203, he ran. Such act in and of itself was sufficient reason for believing some crime had been committed and for authorizing a search. (*People* v. *Martin,* 46 Cal.2d 106, 108 [293 P.2d 52] ; *People* v. *Blodgett,* 46 Cal.2d 114, 117 [293 P.2d 57].) ■ In compliance with Palmer's command to return, appellant reentered his room, engaged in conversation with the officer, and consented to a search of his room. That voluntary consent was alone sufficient authority for the search. ■ His arrest having been justified by the reports of the officer's informant, by appellant's flight and by discovery of opium in the latter's open valise, a search of the room was an incident of his arrest. (*People* v. *Dixon,* 46 Cal.2d 456, 458 [296 P.2d 557] ; *United States* v. *Rabinowitz,* 339 U.S. 56, 61 [70 S.Ct. 430, 94 L.Ed.

653].*) Moreover, after appellant had returned to his room on the order of the officer, the latter asked him "if I could look around in the room and he said, 'Sure, go ahead, I haven't done anything. . . . Somebody planted something on me.'" Taking such reply as consent to a search, the officer found in appellant's open suitcase bottles of opium derivatives.

Appellant assumes that police officers would, to suit their convenience, make use of fictitious informants as bases for illegal searches and seizures. Such assumption is unauthorized and is contrary to statutory presumptions that official duty has been regularly performed and that the law has been obeyed. (Code Civ. Proc., § 1963, subds. 15, 33.) A finding that an officer in a specified case (*People* v. *Cahan,* 44 Cal.2d 434, 436 [282 P.2d 905]) obtained evidence "in flagrant violation of the federal and state constitutions" is no justification for concluding that every policeman has abused the rights of citizens while performing his duties. When an officer has in good faith testified that he had acted upon the information of an unnamed person and that such informant was reliable, he has thereby established a firm basis for his search of a suspect's premises. (Pen. Code, § 836.) Consequently, when a reliable informant told Officer Palmer that appellant had a supply of narcotics in room 203, the officer was then authorized to make the arrest. There is nothing in the Cahan decision, *supra,* or in any subsequent case that attempts to nullify section 836. So long as the good faith of the arresting officer with respect to the reliability of his informant satisfies the scrutiny of the trial judge, he is in substantially the same position as if he had come with a warrant of arrest. (*People* v. *Gonzales,* 141 Cal.App.2d 604, 608 [297 P.2d 50].)

The fact that the officer having defendant in custody inquired for permission to search does not destroy its significance as a voluntary consent. (*Ibid; People* v. *Lujan,* 141 Cal.App.2d 143, 148 [296 P.2d 93].) The officer premised appellant's consent upon the latter's assertion that he had done nothing unlawful. Also, since his arrest was law-

---

*"The right 'to search the place where the arrest is made in order to find and seize things connected with the crime as its fruits or as the means by which it was committed' seems to have stemmed not only from the acknowledged authority to search the person, but also from the longstanding practice of searching for other proofs of guilt within the control of the accused found upon arrest. . . . It became accepted that the premises . . . under the control of the person arrested and where the crime was being committed, were subject to search without a search warrant. Such a search was not 'unreasonable.'"

ful, the search and seizure were legal in that they were made in order to obtain the fruits of the crime whereby to facilitate the court's investigation of the charges against the accused. (*Hatjis* v. *Superior Court,* 144 Cal.App.2d 426, 428 [301 P.2d 44].) The honorable efforts of peace officers to procure evidence of a crime should not be discouraged. By their labors in fetching proofs to the prosecutor, they render a notable service to the state and assure convictions of many major crimes that would otherwise go unpunished.

There was nothing unreasonable about the search. The purpose of the constitutional guaranty is to prevent unreasonable invasions of the peace and security of the people. If an officer is convinced on the basis of reasonable information that a person is sheltering evidence of a specific felony and sees the accused enter that house, the officer should not hesitate to make a reasonable search. (*People* v. *Maddox,* 46 Cal.2d 301, 306 [294 P.2d 6].)

Judgment affirmed.

Fox, J., and Ashburn, J., concurred.