[Crim. No. 7093. Second Dist., Div. Two. Aug. 23, 1960.]

THE PEOPLE, Respondent, v. WARDELL ROBINSON, et al., Defendants; DAVID ALEXANDER BROOKS, Appellant.

Boags & Worrell for Appellant.

Stanley Mosk, Attorney General, William E. James, Assistant Attorney General, and Jack K. Weber, Deputy Attorney General, for Respondent.

FOX, P. J.—Defendant Brooks was convicted on two counts of second degree burglary. The court also found the charge to be true that he had suffered a prior felony conviction for receiving stolen property. He has appealed from the judgment and order denying a new trial.

This appeal involves two separate burglaries: The first related to a burglary on February 9, 1959, of the Andover Shop operated by John A. Pappas on Huntington Drive in San Marino. Defendants Robinson and Brooks were charged with having committed it. The second burglary was on May 24, 1959, and involved Woodruffs Men's Store in nearby Temple City. Robinson, Brooks and DeRosa were charged with this offense.[1] During the course of the trial, the case against DeRosa was dismissed and he was called as a prosecution witness.

In view of the arguments made on behalf of Brooks on this appeal, it is necessary to delineate in considerable detail the circumstances leading up to the commission of these two burglaries and the apprehension and arrest of the defendants. Both of the places burglarized dealt in men's clothing and

---

[1]Robinson pleaded guilty to both charges. He filed a notice of appeal but his appeal has been dismissed.

furnishings. Both were entered by cutting a hole in the side of the store from the adjacent building. This was to avoid disturbing the burglar alarm. Large quantities of men's suits and furnishings were taken from each of these stores through this opening and hauled away.

The first clue in the solution of these burglaries developed when Officer Donald C. Johnson saw a Buick pull up behind the Hi-Hat Cafe at Pico Boulevard and Bedford Street, and observed one David Martin come out of the cafe and go to the car. The driver opened the trunk and removed some clothing. They placed the clothing in the trunk of Martin's car. The officer observed the men exchange money. He inquired of Martin whether he could look in the trunk of his car. Upon receiving an affirmative reply, he opened the trunk and observed brand new suits with the manufacturers' labels and price tags still on them. They had not been altered or tailored. Martin, who had been known to the police for six or seven years by the name of Mario, told the officer that he had obtained some 20-odd suits from a person he knew as ''Rogers'', but who was, in fact, defendant DeRosa. Martin told the officer that he paid $22 apiece for these suits and had sold all but five for $25 each. He had sold them to the person who drove up in the Buick. The suits were being returned as they did not fit. Martin also told Officer Reid that one night he had taken DeRosa to a large pink house in the Wilshire district which is on an elevation some distance from the street. This house was two blocks north of Pico Boulevard and just off of Arlington Boulevard on Country Club Drive. There was a large gate, or posts for a gate, in front. Martin had told the officer that DeRosa intimated that he lived in this house. Officer Reid also had information, through the Orange County investigator's office, that DeRosa was living in this locality in a pink house with a swimming pool in the rear. Martin went with the officers to the house and pointed it out to them. In addition to this information, the officers had in their possession the suits that had been delivered to Martin behind the Hi-Hat Cafe. The officers called Temple City and determined that Woodruffs Men's Store had been burglarized and that suits with the same labels had been taken. Prior to going to the pink house, Officer Johnson received information from the Fullerton Police Department and the district attorney's investigator that a pink house in the Wilshire area was occupied by five or six male Negroes who paid $250 a month rent; that it had a swimming

pool and a guest house. They thought these persons might be involved in burglaries and bank-messenger robberies.

As Officer Johnson arrived at the house he observed another car pull in. He asked the driver whether he lived there, and received an answer in the affirmative. He was told that Robinson rented it and paid $250 monthly rental. The officer observed a Lincoln in the driveway and was informed that ". . . it belongs to Brooks." The officer was also informed that Brooks had an apartment at the rear of the garage. The officers checked the description of the house against the information he had. He noted the pink color, the pool, the guest house, and $250 monthly rental. The officer knocked at Brooks' door and identified himself; he stated that he was looking for stolen clothing, and asked Brooks whether he had any. Brooks said "No," and inquired, "Are you going to come in?" The officer replied, "Well, we would like to; would it be all right?" Brooks stated, "It would be all right for one of you. I have a lady friend with me . . . It would be rather embarrassing for everybody to come in here, going through the apartment, but . . . if you would like to come in and look around, you might." The officer thanked him and said, "Fine." The officer then asked, "Where do you keep your clothes?" Brooks pointed out the wardrobe. The officer saw a bed with someone in it. He couldn't see who it was, but Brooks said it was a lady friend. The officer looked in the wardrobe and observed a quantity of men's clothing, all new. He examined the suits for the labels but many of them had been removed. He inquired of Brooks as to the absence of labels. Brooks said he had purchased the clothes but that they were cheap; that he had removed the labels to avoid embarrassment with friends.

Upon leaving Brooks' place the officer inquired for Robinson's living quarters. They were pointed out to him. The officer knocked and explained to Robinson that he was looking for stolen clothing. Robinson said, "Would you like to come in and look?" Robinson showed him the closet, where he observed numerous articles of clothing that seemed new, but with no labels. There was quite a large quantity, more than the ordinary person would be likely to have. Robinson was asked why the labels were missing. He stated that he bought inexpensive clothing and that he liked to take the labels out so his lady friends wouldn't see he was wearing cheap clothes. The police noted that Robinson had some clothes of the Timely Brand, which was the same brand as those taken

from Woodruffs Men's Store. They then placed Robinson under arrest and searched the rest of the house. During the search, Officer McLean went to the basement and returned carrying five or six varicolored suits. All were new, and had labels. Officer Johnson informed the other officers that while he had been in Brooks' apartment he had looked through the closet and that it was loaded with suits without labels. The officers noted that Brooks and Robinson had similar reasons for removing the labels and concluded that Brooks was in on the crime. They thereupon arrested Brooks and seized a quantity of the new clothing.

The police returned the next evening and, with the permission of Robinson, made further search of the guest house that Brooks occupied as well as the main residence. They discovered additional items of men's clothing, which they took with them.

All of the clothing and wearing apparel that the officers took from these premises were of the type sold at Woodruff's or Andover's, and all the items were of the kind the store representatives described as missing. Much of the wearing apparel recovered by the police came from the guest house occupied by Brooks. It is true that many of the articles could not be specifically identified as having been in either store. However, a gray suit, for example, was identified as coming from Andover because of its particular styling; a tweed coat was made of a fabric especially prepared for Andover; a gray jacket with silver buttons was made from a fabric which was sold exclusively through Andover; another suit was identified as Andover merchandise because of its cloverleaf lapels; still another had been made especially for Andover; another was on an Andover hanger; one was made by an English company for Andover. Included in the property recovered was a wine flask that had been imported from Spain by Andover; also five belts labeled "The Andover Shop"; also included were five tags marked "Woodruff's, 7-95." The officers also discovered a saw and hatchet in the leaves near the garage. These were identified by DeRosa as some of the tools used in cutting the hole through the wall into Woodruff's store.

According to the testimony of DeRosa he, Robinson and Brooks had been looking around for a place to break into. DeRosa happened to observe Woodruff's store and told Brooks about it. They drove out and looked it over on a Sunday. They decided how the place would be entered, and explained

the situation to Robinson. They planned the entry on the following Sunday night and Monday morning. DeRosa then explained in detail the *modus operandi* by which they gained entrance to the adjoining building, cut the hole in the wall into the store, passed the clothing and other paraphernalia out through this hole, placed it in a truck, and drove to Robinson's and Brooks' residence, where the loot was unloaded in the garage and divided into three separate lots.

DeRosa testified that Brooks at one time gave him a belt which had the name "Andover Shop" on it. DeRosa asked him whether "this was one of the hot ones." Brooks did not reply—just laughed. DeRosa then took a hot iron and obliterated the name. DeRosa also testified that on another occasion he and Brooks were going along Huntington Drive; that Brooks pointed out the Andover Shop to him, and commented: "What a nice job that was; too bad we didn't do that one together."

Defendant testified that when the police officers came to the guest house where he was living on the night in question, they said they would like to come in and look around. He told them that he had an overnight guest and would not permit them to enter. One officer, however, entered anyway, went over to the wardrobe and looked through the wearing apparel. Defendant told the police that he had no knowledge of the things in which they were interested; that he purchased his clothing from wholesale outlets, and that was why he removed the labels. The officer, according to defendant, walked out and stated that everything appeared to be all right. About 45 minutes later the officers returned, started pulling out clothing, and told him to dress. The woman in bed corroborated Brooks' story. Brooks also stated that he received numerous gifts of clothing from Robinson, whom he knew to be in the apparel business. He denied having participated in burglarizing either store. In explanation of DeRosa's testimony against him, Brooks testified that at one time he intervened in an argument between DeRosa and a woman; that he refused to loan his car to DeRosa at another time; and that DeRosa once wanted him to provide an alibi, which he refused to do.

In seeking a reversal defendant has attacked the judgment upon numerous grounds. We have concluded that none of them is well founded.

Initially, defendant argues that the evidence which

the officers secured in searching his apartment was inadmissible on the ground that there was lack of probable cause therefor. The foundation for this argument is defendant's own testimony that he refused to allow the officers to search his premises. The officers, however, testified that defendant freely consented to a search of his premises provided it was done by only one officer since he had a guest in the apartment. This request was respected. The resolution of this conflict was for the trial court (*People* v. *Guy,* 145 Cal.App.2d 481, 490 [302 P.2d 657]), which impliedly found that he consented to the search. Since defendant consented to the search it must be held that it was legal and that the evidence thus obtained was properly admissible. (*People* v. *King,* 175 Cal. App.2d 386, 389 [346 P.2d 235]; *People* v. *Burke,* 47 Cal.2d 45, 49 [301 P.2d 241].)

Defendant makes the contention that the evidence is insufficient to support his conviction. ■ In this connection it must be borne in mind that before a reversal may be had on this ground it must be made clearly to appear that upon no hypothesis whatever is there sufficient substantial evidence to support the conclusion reached in the court below. (*People* v. *Newland,* 15 Cal.2d 678, 681 [104 P.2d 778].) ■ Also, we must assume in support of the judgment the existence of every fact which the trier of fact could have reasonably deduced from the evidence, and then determine whether the facts "justify the inference of guilt." (*People* v. *Deysher,* 2 Cal.2d 141, 149 [40 P.2d 259].)

■ Applying these principles, it is clear that the defendant was a participant in both of these burglaries. He was found in possession of stolen merchandise. This is a circumstance bearing on his guilt. (*People* v. *Williamson,* 168 Cal. App.2d 735, 742 [336 P.2d 214].) ■ While mere possession of stolen goods is not sufficient, if standing alone, to sustain a conviction of burglary, yet "such possession is a circumstance strongly indicating the guilt of the person" (*People* v. *Jackson,* 146 Cal.App.2d 553, 556 [303 P.2d 767]) and only slight additional corroborative evidence is needed to sustain a conviction. (*People* v. *Citrino,* 46 Cal.2d 284, 288 [294 P.2d 32].) ■ Defendant had numerous items in his apartment from the Andover Shop. In addition, defendant made incriminating admissions to DeRosa relative to the Andover Shop, commenting that it was a nice job, and too bad that they did not do it together. Then there is the instance

of defendant's giving DeRosa an Andover belt, and his failure to make an explanation when DeRosa inquired of him whether it was one of the hot ones. This impelled DeRosa to obliterate the shop's name to conceal its origin. Defendant had in his possession numerous items similar to those taken from the Woodruff store. In addition, there was a detailed explanation by DeRosa of the manner in which the store was broken into and the merchandise removed. Also, there was a marked similarity in the *modus operandi* by which both stores were burglarized. Without specifically referring to further incidents, it is apparent from a mere reading of the initial summary of the evidence herein that defendant participated in both burglaries.

But, argues defendant, DeRosa was an accomplice, and, under Penal Code, section 1111, his testimony would require corroboration in order to sustain the conviction. He then argues that there was a lack of necessary corroboration. It is true that DeRosa was an accomplice in the burglary of the Woodruff store. However, there was ample corroboration, for it is the law that "if possession of stolen goods soon after a burglary is unexplained or the attempted explanation [is] rejected by the jury, such alone is sufficient corroboration." (*People* v. *Carswell*, 149 Cal.App.2d 395, 402 [308 P.2d 852]; *People* v. *Miller*, 54 Cal.App.2d 384, 386 [128 P.2d 785]; *People* v. *Haughey*, 79 Cal.App. 541, 543 [250 P. 406].) The similarity of the commission of crimes is another circumstance of a corroborative nature. (*People* v. *Otterman*, 154 Cal.App. 2d 193, 209 [316 P.2d 85]; *People* v. *Weitz*, 42 Cal.2d 338, 347 [267 P.2d 295].) In this connection it is significant that the burglary of the Andover Shop paralleled that of the Woodruff store. Each burglary was accomplished in the same manner of entry by first breaking into the office next door, where there was no burglar alarm, and cutting a hole through the side wall, thus avoiding the likelihood of disturbing the burglar alarm of the store, which is generally at the front or the rear of the building. Each crime had the same identifying technique. The defendant had a great number of men's suits and men's other furnishings that came from the Andover Shop. Furthermore, DeRosa was not an accomplice in that burglary. What he testified to about that crime did not come from a tainted source. It is therefore clear that the corroborating facts and circumstances were ample to meet the requirements of Penal Code, section 1111.

 Defendant claims error as to the time and circumstances under which DeRosa, the accomplice, was called to testify. Defendant tells us that the People dismissed their case against DeRosa after the defendant had started his defense, and that this procedure transgresses the provisions of section 1099 of the Penal Code.[2] However, a review of the record discloses that defendant had not in fact started his defense and that the prosecution had not rested its case at the time the deputy district attorney moved to discharge DeRosa and then called him as a witness for the People. The record shows that the defendant had called two witnesses out of the presence of the jury solely for the purpose of rebutting prosecution witnesses who had testified concerning the lawfulness of the search of defendant's premises and the seizure of the clothing and other items found therein, and more especially with reference to whether or not defendant had consented to the entry made by the police officers. By stipulation of all parties and with the consent of the court this issue was tried out of the presence of the jury and the testimony elicited in behalf of defendant was limited to this single issue. Immediately following the ruling by the trial court that the evidence so obtained was admissible and that it was not the product of an unlawful search and seizure, the jury was recalled and the prosecution proceeded with its case in chief. Several witnesses were then called by the prosecution for the purpose of identifying the items recovered from defendant's premises and it was not until the conclusion of this testimony that the prosecutor made his motion under section 1099. It is clear, therefore, that the mandatory requirements of section 1099 were not violated and that DeRosa was properly discharged and called as a witness for the people. Since the procedure followed was specifically authorized by section 1099 there could be no error. (*People* v. *Chapman,* 91 Cal.App.2d 854 [206 P.2d 4] ; *People* v. *Bocchio,* 80 Cal.App. 138 [251 P. 672] ; *People* v. *Griffin,* 98 Cal.App.2d 1 [219 P.2d 519].)

 The defendant next argues that the prosecution was guilty of misconduct in presenting to the jury a sham co-defendant in the person of DeRosa, and that this resulted in denying defendant a fair trial. Defendant asserts that a

---

[2]Penal Code, section 1099, reads as follows:
"When two or more defendants are included in the same accusatory pleading, the court may, at any time before the defendants have gone into their defense, on the application of the prosecuting attorney, direct any defendant to be discharged, that he may be a witness for the people."

" 'devil's bargain' was made by the prosecutor's promising the accomplice (DeRosa) immunity in exchange for his testimony." The record fails to disclose any promise of immunity. It appears that the prosecutor did interview DeRosa in the presence of his counsel. Such interview was not, of course, misconduct nor would it have been misconduct even if there had been a bargain to testify for the People in exchange for immunity, provided he was only required to testify fairly and truthfully. (See *People* v. *Lyons,* 50 Cal.2d 245, 265-266 [324 P.2d 556].) It is thus clear that there is no merit in this contention.

Defendant argues that the court erred in failing to instruct the jury that evidence received against DeRosa should not be considered as evidence against him. The first difficulty with this argument is that he failed to ask for any instruction limiting the effect of evidence that was admitted generally.

Any objection he may have had was therefore waived, and cannot be raised for the first time on appeal. (*People* v. *McGoldrick,* 107 Cal.App.2d 171, 174 [236 P.2d 597].)

Furthermore, it does not appear that such an instruction would in any event have been proper. Examination of the record indicates that only two items were received in evidence after having been taken from the possession of DeRosa. These were People's 17, a pair of shoes taken from Woodruff's store, and People's 59, the belt which defendant gave to DeRosa with the Andover name on it, and which DeRosa obliterated. The belt had particular significance in that it tended to corroborate DeRosa's story, for defendant's attitude led DeRosa to believe that it was stolen, thus manifesting conduct which indicated an admission. The shoes, too, corroborated DeRosa's story, in that his possession of them tended to show that he was in on the burglary of Woodruff's store, as he testified, since they came from there.

Defendant next contends that his prior conviction was in reality only a misdemeanor and not a felony. Upon being convicted of receiving stolen property, proceedings were suspended and defendant was placed on three years' probation. Proceedings having been suspended after his plea of guilty to an offense which is punishable either as a felony or a misdemeanor, the offense stands as a felony, absent a judgment, and no judgment was pronounced. (*People* v. *Banks,* 53 Cal. 2d 370, 381-388 [1 Cal.Rptr. 669, 348 P.2d 102]; *People* v. *Lippner,* 219 Cal. 395, 403-405 [26 P.2d 457].)

As a condition of probation defendant was ordered to pay a fine of $1,000, which was paid and probation was terminated. A fine, imposed as a condition of probation, is not a sentence or a judgment. (*In re McVeity,* 98 Cal.App. 723, 727 [277 P. 745]; *In re Goetz,* 46 Cal.App.2d 848, 851 [117 P.2d 47]; *People* v. *Kuhlman,* 86 Cal.App.2d 566, 568 [195 P.2d 53, 196 P.2d 80].) Therefore his former conviction is still a felony. (*People* v. *Banks, supra.*)

There is no merit whatever in defendant's final contention, that the prosecutor committed prejudicial misconduct in refusing to waive a jury trial on the issue of defendant's prior conviction. While it is true that the prosecutor initially refused to waive a jury trial on the issue of the alleged prior conviction, he nevertheless ultimately did waive, and the issue was never put to the jury. The only mention of the prior was as a basis for impeachment of defendant. There cannot be any possible prejudice growing out of this procedural aspect of the case.

The judgment and the order denying motion for a new trial are affirmed.

Ashburn, J., and Richards, J. pro tem.,* concurred.

Appellant's petition for a hearing by the Supreme Court was denied October 19, 1960.

*Assigned by Chairman of Judicial Council.