[Crim. No. 14990.    Second Dist., Div. Four.    May 27, 1969.]

THE PEOPLE, Plaintiff and Respondent, v. ADELE JETER MARSHALL, Defendant and Appellant.

Frank Gafkowski, Jr., for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Robert J. Polis, Deputy Attorney General, for Plaintiff and Respondent.

KINGSLEY, J.—Defendant was charged in count I with murder (Pen. Code, § 187), and in count II with abortion (Pen. Code, § 274). She pled not guilty, waived jury trial, and by stipulation the matter was submitted on the transcript of the preliminary hearing.

The court found defendant guilty of murder in the second degree. A motion for new trial was denied, the conviction was reduced to voluntary manslaughter, sentence was suspended

and probation granted for three years on condition that defendant spend the first year in the county jail. Count II was dismissed. This appeal is from the judgment of conviction (order granting probation).

In June 1967, Miss Noreen Date informed her boyfriend, Jimmy Torres, that she was pregnant. Torres, age 21, contacted Steven Murchison, a fellow worker at Douglas Aircraft, and asked if he knew anyone who could give his girl friend an abortion. On June 19, Mr. Murchison called Jimmy Torres and, according to Torres, transferred the telephone to an unidentified woman. This same woman (defendant) called Mr. Torres again on June 22d to make the final arrangements.

Shirley Fukumoto and Janet Aguilera, who knew Miss Date before these events, picked Miss Date up at her home on June 22d. On the way to Jimmy Torres' apartment they stopped at Noreen's place of work to pick up her check, which was subsequently cashed.

Noreen was given $200 by Mr. Torres. This money was given to Janet Aguilera to hold, but later it was transferred to Shirley Fukumoto.

Directed by Jimmy Torres to go to Manchester and Normandy at 7:30, Miss Date left with Janet Aguilera and Shirley Fukumoto in the latter's automobile. All three joined defendant, who called herself Gayle, and they drove to a place near Century Boulevard where they were let into an apartment by a Negro lady at around 8.

Defendant cleared the kitchen table. She opened a black bag and removed some pills, a clamp, a tube, a bulb device, a syringe and penicillin.

Defendant explained to Miss Aguilera that the tube was to go into Noreen's uterus to insert the liquid that would cause the abortion. Noreen was given three little pills, two capsules, and a shot of penicillin in the buttocks' area. Both Miss Fukumoto and Miss Aguilera left the kitchen as Noreen removed her capris and panties.

Joined by the Negro woman and Miss Fukumoto in the front room, Janet Aguilera saw defendant "unrolling or unfolding" a coat hanger before she turned away. Defendant was heard to ask Noreen to keep talking to her.

Both Miss Fukumoto and Miss Aguilera heard a gurgling sound, after which it sounded as if Noreen was having difficulty breathing.

Defendant called for someone to try to keep Noreen awake since she was passing out and Janet Aguilera went into the

kitchen. Noreen stiffened and started to gasp. Shirley Fuku-moto came into the kitchen. Noreen, back- arched and chin back, was still having difficulty breathing. They sat her up but she passed out.

On the table was a long orange tube, pliers, and a white bulb in a glass jar with a milk colored fluid. The three of them dressed Noreen, placed her limp body on the rear seat in the car. Defendant drove all four to Morningside Hospital.

Defendant warned that they should say they were riding around and Noreen said she was feeling sick, because in case they found out they would go to jail.

Defendant got a hospital attendant to carry Noreen in. Shirley paid defendant and returned to the hospital to dis-cover that Noreen had died.

Defendant told Murchison of the death, told him not to say anything, and offered him $50 for giving her Jimmy Torres' name, but he refused to accept.

Death was caused by a massive air embolism—air in the circulation system. Noreen had been pregnant and the uterus contained a fetus and a placenta- which had been recently separated, exposing some large veins into which the injected air entered.

A police officer (stipulated to be an expert in abortion investigations) testified that the instruments seen by the two women witnesses were instruments used in committing abor-tions.

I

There can be no question that, unless the testimony required corroboration under the accomplice rule, the evidence was more than sufficient to sustain a judgment of conviction.[1] But it is claimed that all four witnesses were accomplices, whose testimony, under section 1108 of the Penal Code, required corroboration. ■ Since the testimony of one accomplice cannot be used to corroborate the testimony of another (*People* v. *Creegan* (1898) 121 Cal. 554 [53 P. 1082] ; *People* v. *Jehl* (1957) 150 Cal.App.2d 665 [310 P.2d 495]), and since there is no corroborative evidence beyond the testi-mony of the four witnesses, the conviction must fail unless one or more of the witnesses are not accomplices to the crime.

Penal Code section 1111 defines an accomplice as ''one who is liable to prosecution for the identical offense charged

---

[1] For reasons discussed below, we find it necessary to modify the judg-ment from one for voluntary manslaughter to one for involuntary man-slaughter.

against the defendant on trial in the cause in which the testimony of an accomplice is given." (*People* v. *Howell* (1924) 69 Cal.App. 239, 241 [230 P. 991].) ▮ The rationale for requiring corroboration of an accomplice is that the hope of immunity or clemency in return for testimony which would help to convict another makes the accomplice's testimony suspect, or the accomplice might have many other self-serving motives that could influence his credibility. (*Accomplice Corroboration—Its Status in California* (1962) 9 U.C.L.A. L.Rev. 190-191.)

The California cases on the subject are by no means entirely consistent and the cases which hold that a particular participant in an abortion is an accomplice as a matter of law frequently do not refer to the other cases in which participants who did almost similar acts were held not to be accomplices as a matter of law. ▮ We conclude that, on the facts of the case at bench, the conduct of the two women, and perhaps that of the two men, was not such as to require us to hold that they were accomplices as a matter of law and that the trial court's implied finding that at least one witness was not an accomplice must be sustained.

▮ Mere accompaniment of the victim of an abortion to the defendant's residence or place of business, although with realization at the time that the victim's purpose in going there is to have an abortion, does not necessarily make the companions accomplices as a matter of law. (*People* v. *Davis* (1954) 43 Cal.2d 661, 673 [276 P.2d 801]; *People* v. *Balkwell* (1904) 143 Cal. 259, 262 [76 P. 1017]; *People* v. *Brewer* (1912) 19 Cal.App. 742, 746 [127 P. 808].) ▮ Whether or not persons accompanying aborted women were accomplices depends on whether or not they aided and abetted in the commission of the abortion charged, or, not being present, had advised or engaged its commission, or had conspired to procure the abortion. (*People* v. *Davis* (1954) 43 Cal.2d 661 [276 P.2d 801].)

▮ The general rule is that whether or not one is an accomplice is a question of fact for the trier of fact (*People* v. *Washington* (1962) 203 Cal.App.2d 609, 610 [21 Cal.Rptr. 788]), and this rule appears to have been applied in cases where the purported accomplices' conduct in relation to the abortion was much more affirmative than mere knowing accompaniment of the victim to the abortionist's premises.

In *People* v. *Kramer* (1968) 259 Cal.App.2d 452, 465-466 [66 Cal.Rptr. 638], the court held that there was no error

where the court did not instruct the jury that the roommate was an accomplice as a matter of law, where the roommate secured and got a prescription filled for the victim.

In *People* v. *Wilson* (1942) 54 Cal.App.2d 434, 446 [129 P.2d 149], the witness talked to defendant on the telephone, took decedent to defendant's house, asked defendant what to do regarding treatment, but did not go into the house and advised against the abortion. The court held that whether or not the witness was an accomplice was a question of fact.

In *People* v. *Alvarez* (1946) 73 Cal.App.2d 528, 530 [166 P.2d 896], the court held that whether or not the person who prepared a room for the abortion and purchased a catheter was an accomplice or not was a question of fact for the trial court. This court also held that whether or not the person who buried the fetus was an accomplice was also a question of fact for the trial court.

In *People* v. *Darrow* (1931) 212 Cal. 167, 169 [298 P. 1], it was held that the court properly left to the jury the question of whether or not the witness was an accomplice, where the witness paid for the abortion, where he held chloroform next to the victim's nose during the abortion, where he held the abortee's hands during the abortion.

We cannot say the participation of any of the witnesses herein was necessarily any greater than the participation of the witness in the cases above discussed in which it was held that they were not accomplices as a matter of law.

## II

As above noted, the trial court, exercising its statutory power under subdivision 6 of section 1181 of the Penal Code in denying a motion for a new trial, reduced the degree of the crime from murder to manslaughter. At first it announced the reduction to that of involuntary manslaughter; thereafter the judge said: "I made a mistake in my previous modification. I am going to vacate that order and find her guilty of voluntary manslaughter." We conclude that the court was correct in its first action but erred in its revision.

Although there is language in the cases to the effect that, since the penalty for voluntary and for involuntary manslaughter is the same, there is only one crime—"manslaughter"—and that it is a matter of legal indifference which adjective is applied, the later cases have held that the two kinds of manslaughter are different crimes. (*People* v. *Wynn* (1968) 257 Cal.App.2d 664, 675-676 [65 Cal.Rptr. 210]; *People* v. *Bross* (1966) 240 Cal.App.2d 157, 171 [49 Cal.Rptr.

402].) It has also been held that a trial court may not, in reducing an offense, "reduce" it to an offense which the record shows was never committed. (*People* v. *Wilson* (1969) 271 Cal.App.2d 60 [76 Cal.Rptr. 195]; *People* v. *Hunter* (1962) 208 Cal.App.2d 633 [25 Cal.Rptr. 492]; and see *In re Bevill* (1968) 68 Cal.2d 854, 862 [69 Cal.Rptr. 599, 442 P.2d 679].)

The cases are not clear as to the action that an appellate court should take in such a situation. In *Bevill*, the original charge was of a statute that defendant could not have violated, so that the only remedy was to order his discharge; in *Wilson*, the appellate court reversed the judgment with directions to resume the trial at the point of the new trial motion; in *Wynn*, the appellate court considered modification in that court but declined because the record showed that defendant might have committed the variety of manslaughter of which he stood convicted. ■ In the case at bench we do not have the complication of proceedings that existed in *Wilson*, and we do have a record showing guilt of involuntary manslaughter[2] but not of voluntary manslaughter.[3] We conclude that the interests of justice are best served by a modification here; we so direct.

The judgment is modified by deleting the word "voluntary" and inserting in lieu thereof the word "involuntary"; as so modified, it is affirmed.

Files, P. J., and Jefferson, J., concurred.

[2]The record shows negligence in performance of the operation which the trial court could have found was of the degree involved in manslaughter.

[3]Clearly defendant had no intent to take her victim's life, and there is nothing to suggest any diminishment of her mental capacities.