[Crim. No. 16494. Second Dist., Div. Five. May 28, 1971.]

THE PEOPLE, Plaintiff and Respondent, v.
H. EDWARD SCOFIELD, Defendant and Appellant.

**COUNSEL**

Gary W. Sawtelle for Defendant and Appellant.

Evelle J. Younger, Attorney General, William E. James, Assistant Attorney General, and Howard J. Schwab, Deputy Attorney General, for Plaintiff and Respondent.

## OPINION

**REPPY, J.**—By grand jury indictment defendant-appellant H. Edward Scofield, along with Dr. Everett W. DeLong (Dr. DeLong) and Freda Mae Nelson (Nelson), was charged with presenting a fraudulent insurance claim to the Aetna Casualty and Surety Company (Aetna) on or about June 1, 1962, in violation of Insurance Code section 556, subdivision (a).[1] After a jury waiver (a subject of contention on appeal) the matter was submitted on the transcripts of the preliminary hearing and of the grand jury indictment proceedings.[2] Defendant was found guilty of attempt of violation of section 556, subdivision (a) of the Insurance Code, a lesser and necessarily included offense and sentenced to 90 days in the county jail.

The trial court stated that it had examined grand jury exhibit No. 20 and had read the testimony of Harold E. Crozier, Jr., (Crozier), Dean C. Dunleavy (Dunleavy), Claris Von Berg (Von Berg), Ann Moran (Moran), and Mary DuBois (DuBois). Exhibit 20 consists of several bills for treatment rendered to Nelson. Two are from Doctors Hall and Matzen for radiology. One (hereinafter referred to as the May 18 bill) is addressed to defendant and consists of six pages. The first three pages, signed by Dr. DeLong and dated May 15, 1962, are Nelson's medical history, diagnosis, and prognosis. The remaining three pages, dated May 18, 1962, are itemized statements setting forth the individual dates of treatments, commencing March 21, 1960, and ending May 8, 1962, the type of treatments, and the charges for the treatments, totalling $1,759.

The following is a summary of the testimony of each of the witnesses referred to by the trial court:[3]

*Crozier:* As claims representative for Aetna, he investigated a claim filed personally by Nelson arising out of a March 16, 1960, auto accident. A suit for damages on the claim and for lulling Nelson into a false sense of

---

[1]The multicount indictment also charged defendant with insurance fraud or conspiracy to commit insurance fraud in each of the other counts, not relevant herein.

[2]Certain counts of the indictment, including the count in question, the Nelson count, were consolidated with an information brought against defendant and DeLong; the Nelson count became count VIII. Only count VIII was called for trial, and the matter was submitted on the transcript of both proceedings, although the information, and therefore the preliminary hearing, was not concerned with the Nelson fraud.

[3]The record contains testimony of other witnesses. Defendant, however, contends that we may not consider such testimony because we are limited in our review of the evidence to that which the trial court indicated that it had read and because some of that testimony concerned evidence that was allegedly illegally obtained. We are somewhat dubious of defendant's position. However, we need not pass upon his points because we feel that the trial court's finding is sustainable on the evidence it did consider.

security in letting the statute of limitations run was brought against Aetna and Crozier, with defendant acting as Nelson's attorney. Crozier received from Aetna's attorney, Dunleavy, letters written by defendant representing that he on behalf of Nelson, was making a claim of $6,000 and the medical bills (in Exhibit 20) which had been submitted in support of this claim. Dunleavy's letter transmitting the bills was dated June 15, 1962, and indicated that he had received them a "few days [previously] from plaintiff's counsel."

*Dunleavy:* He negotiated Nelson's claim against Aetna with defendant, her attorney. On June 1, 1962, defendant sent him the May 18 bill in support of that claim. On August 20, 1962, Dunleavy took Nelson's deposition, with defendant present at defendant's elaborate home in Beverly Hills. He had a lengthy discussion with defendant on Nelson's treatments, almost entirely physiotherapy, which defendant told him had been given by Dr. DeLong.

*Von Berg:* She was employed by Dr. DeLong as a medical assistant and office worker who handled the office overload of medical insurance from June until the second week in November 1961. Defendant came to the office many times, once or twice as a patient, and otherwise on personal business calls. Dr. DeLong instructed her that defendant's clients were to be billed for treatments three times a week regardless of whether actual treatment had been given. She was to check with defendant concerning the duration of the treatments to be put on the billing and how much the final settlement should be. She would call defendant's office and receive his instructions although she did not talk to him personally. She gave Nelson injections, at the most, twice a week. Although it was her duty to render physiotherapy treatments and she would have known about any such treatments, she did not render any to Nelson. During her period of employment, Nelson did not visit the office as often as, or receive the physiotherapy treatments, reflected in the bill. She overheard conversations of defendant and Dr. DeLong regarding certain patients, what the insurance settlements should be, when the cases should be terminated, and when they should be submitted. Defendant would receive copies of bills for his clients.

*Moran:* She was employed by Dr. DeLong from June 1961 to January 2, 1962, as a technician and general office worker. She gave physiotherapy only once or twice. She was instructed by Dr. DeLong and defendant that she should bill defendant's clients as if they had received treatment three times a week (some treatments, taken from the patient's chart, were authentic; others were filled in by the use of the calendar), and that she should call defendant to find out the amount of the bill. After making the bill,

she would fill in the "phony" treatments on the patient's records. She took some of the bills to defendant's home personally. She gave Nelson perhaps one shot and no physiotherapy treatments. During her employment, Nelson did not come to the office for treatment as frequently as the May 18 bill indicated. Nelson came to the office in reference to insurance and called often wanting to know why the insurance papers were not sent through. Moran prepared one bill for Nelson, but not the May 18 bill. Moran left the office when narcotics agents and the FBI started investigating and questioning the personnel.

*DuBois:* She worked for Dr. DeLong, replacing Von Berg, from October 1961 through November 1962, as a medical assistant and as compiler of insurance forms and personal injury reports. The cases of defendant's personal injury clients were not put in the regular bookkeeping system; these patients had separate cards. She prepared bills for defendant's clients showing treatments, which were not in fact true reflections of what patient records showed, according to telephoned instructions from defendant. Dr. DeLong told her that it was the office's policy to submit fraudulent bills to insurance companies, that it would submit a bill for at least $300 for $100 worth of treatment, and that defendant, the patient, and "we" would each get $100. Defendant instructed her to lower the charges made for his clients because insurance companies balked at their size. DuBois treated Nelson occasionally. She prepared the May 18 bill, which reflected physiotherapy treatments and injections which had not been given. Some of the information on that bill was taken from Nelson's patient records and some "from the calendar three times a week." Defendant did not specify any particular amount for this, "but the instructions were to make the bill to begin treatments at the time of the accident, up until the last treatment date." On January 12, 1962, while visiting defendant in his home with Levine, DuBois was told by defendant "that if anybody tried to do to him what evidently was trying to be done to Dr. DeLong, he would be like a rat in the corner, and he would have his back in the corner like a rat, and he would kill the person, whoever it was." At that time defendant pointed his finger at DuBois and said that she was the only one who could implicate him relative to the insurance frauds.

Defendant contends on appeal that he did not give a valid waiver of his right to a jury trial, that the evidence was insufficient to support his conviction, and that witnesses Von Berg, Moran, and DuBois were accomplices whose testimony required corroboration to support the conviction.

## CONCERNING THE JURY WAIVER

The clerk's minutes recite: "The defendant personally and all counsel

waive jury trial. By stipulation of all counsel the cause is submitted on the testimony contained in the transcript of the proceedings had at the preliminary hearing. . . ." The reporter's transcript contains no record of the waiver and submission. However, the trial judge and trial counsel for both defendant and the prosecution have filed affidavits indicating that in open court defendant personally waived jury trial and the cause was submitted on the transcripts and exhibits of both the preliminary hearing and grand jury proceedings.

■ In order to be valid, a defendant's waiver of his right to jury trial must be made personally in open court. (*People v. Pechar,* 130 Cal. App.2d 616, 617 [279 P.2d 570]; *People v. Washington,* 95 Cal.App.2d 454, 455 [213 P.2d 70].) ■ Relying on *People v. Washington, supra,* defendant asserts that the conviction should be reversed because of conflict in the clerk's and reporter's transcripts as to the existence of a valid jury waiver. However, in *Washington* there was a real conflict in that the clerk's transcript stated that the jury was waived by both defendant and counsel while the reporter's transcript reflected that the jury was waived only by defense counsel and not by defendant personally. Here the reporter's transcript omits the proceedings at which the waiver occurred. These proceedings should definitely have been in that transcript, but in view of the uncontroverted affidavits of the trial court and both counsel, it is clear that the waiver was properly taken. (See *People v. Prezas,* 195 Cal. App.2d 850, 851-852 [16 Cal.Rptr. 274].)

### CONCERNING THE EVIDENCE

■ The evidence, as recited in the statement of facts, compels the determination that there was substantial evidence (see *People v. Redmond,* 71 Cal.2d 745, 755 [79 Cal.Rptr. 529, 457 P.2d 321]) that defendant attempted to violate Insurance Code section 556, subdivision (a) in that the May 18 bill was false and in that, when defendant submitted it to Aetna, he had knowledge of that fact and had the specific intent to defraud. The prosecution proved convincingly that Nelson did not receive most of the treatments in the bill. It was not necessary that it prove which particular entries in the bill were the false ones.[4]

■ An intention to defraud is an essential element of the offense under review, but it may properly be determined from a consideration of all the circumstances. (*People v. Benson,* 206 Cal.App.2d 519, 529 [23 Cal. Rptr. 908], overruled on another point in *People v. Perez,* 62 Cal.2d 769,

---

[4]In both *People v. Palmer,* 53 Cal. 615 and *People v. Mahony,* 145 Cal. 104, 106 [78 P. 354], cited by defendant, the issue was not the sufficiency of the evidence, but rather the adequacy of allegations in the indictment.

776 [44 Cal.Rptr. 326, 401 P.2d 934].) ■ One who wilfully submits a claim, knowing it to be false, necessarily does so with intent to defraud. (*Id.*) ■ Section 556 extends to the acts of an attorney in knowingly presenting a fraudulent claim on behalf of a client. (*Scofield* v. *State Bar,* 62 Cal.2d 624, 628-629 [43 Cal.Rptr. 825, 401 P.2d 217].) ■ Although DuBois did not testify that defendant gave her instructions on the making of this particular bill, the evidence clearly established that defendant and Dr. DeLong operated under an agreement that the bills for defendant's personal injury clients would contain false entries, that the information regarding the total amount of the bills and the period for which they should reflect treatments would be given by either Dr. Delong or defendant, and that this particular bill was prepared pursuant to that agreement. Defendant surely knew of the fraudulent nature of the bill when he submitted it.

## CONCERNING ACCOMPLICES

■ Defendant's final contention is that Von Berg, Moran, and DuBois were accomplices and that there was not sufficient corroboration of their testimony to support the conviction. Penal Code section 1111 provides that "[a] conviction can not be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense," and it defines an accomplice as "one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given."

■ The testimony of one accomplice cannot corroborate the testimony of another. (*People* v. *Marshall,* 273 Cal.App.2d 423, 426 [78 Cal.Rptr. 16].) If all of Dr. DeLong's employees are accomplices, there is not sufficient corroboration of their testimony to support a finding of defendant's guilt. (See *People* v. *Anthony,* 29 Cal.App.2d 290 [84 P.2d 523].)

■ An accomplice includes all persons concerned in the commission of the offense, whether they directly commit the act constituting the offense or aid and abet in its commission. (*People* v. *Goldstein,* 146 Cal.App.2d 268, 272 [303 P.2d 892].) The Attorney General argues that the women could not have been accomplices because they were merely acting as employees and, at most, had knowledge of the crime and not any criminal intent. ■ However, to "aid *and* abet" means " 'to . . . encourage . . . or aid *with guilty knowledge of the wrongful purpose of the perpetrator'.* . . .. ■ The logical basis for conviction as an aider and abettor is that *with knowledge of the unlawfulness of the act,* one renders some independent contribution to the commission of the crime or otherwise makes it more probable that the crime will be successfully completed than would

be the case absent such participation." (Italics supplied.) (*People* v. *Belenger*, 222 Cal.App.2d 159, 163 [34 Cal.Rptr. 918]; see *People* v. *Terry*, 2 Cal.3d 362, 401 [85 Cal.Rptr. 409, 466 P.2d 961]; *People* v. *Goldstein*, *supra*, 146 Cal.App.2d 268, 272-273; *People* v. *Wood*, 56 Cal.App. 431 [205 P. 698]; Perkins on Criminal Law (2d ed. 1969) Imputability—Parties to Crime, pp. 662-663.)

It is apparent from DuBois' testimony that she prepared the May 18 bill knowing it would be submitted in support of a fraudulent insurance claim. In so doing she aided and abetted defendant in his June 1 submission of the bill in support of the fraudulent claim. (Accord: *People* v. *Zelver*, 135 Cal.App.2d 226, 232 [287 P.2d 183].) DuBois, therefore, was an accomplice.

It is also apparent from the testimony of Von Berg and Moran that they prepared bills with guilty knowledge of their fraudulent nature and purpose. However, there is no indication in the record that they aided and abetted the particular offense under consideration. (See Pen. Code, § 1111; *People* v. *Owens*, 28 Cal.2d 191, 193 [168 P.2d 945] and *People* v. *Robinson*, 184 Cal.App.2d 69, 77 [7 Cal.Rptr. 202] [holding that testimony of a witness who was an accomplice to one offense charged against the defendant can corroborate the testimony of an accomplice to another offense charged against the defendant]; see also *People* v. *Gallardo*, 41 Cal.2d 57, 63 [257 P.2d 29].) The offense of which defendant was convicted involved his presentation on June 1 of the May 18, 1962, bill in support of the $6,000 demand. In view of DuBois' testimony that she prepared the bill, Von Berg's testimony that she ceased working for DeLong in November 1961, and Moran's testimony that she ceased working for him in January 1962, it is apparent that Von Berg and Moran had nothing to do with the preparation of this bill. (See *People* v. *Graham*, 191 Cal.App.2d 521, 538 [12 Cal. Rptr. 893].) They, therefore, were not accomplices.

The fraudulent aspect of the May 18 bill was part of the corpus delicti, and this could properly be established by the testimony of DuBois alone since an accomplice's testimony as to the corpus delicti need not be corroborated. (*People* v. *Simpson*, 43 Cal.2d 553, 563 [275 P.2d 31]; *People* v. *Neely*, 163 Cal.App.2d 289, 301 [329 P.2d 357].) In fact, however, it was corroborated by Von Berg's and Moran's testimony to the effect that Nelson had not received the treatments reflected in the bill during their employment. Only defendant's connection with the crime need be corroborated, and the question for the trier of fact is to determine whether there was any substantial corroborative evidence. (*People* v. *Malone*, 82 Cal.App.2d 54, 60 [185 P.2d 870].) "Although the corroborating evidence must raise more than a conjecture or suspicion of

guilt, it is sufficient if it connect the defendant with the commission of the crime in such a way as reasonably to satisfy the fact finding body that the accomplice is telling the truth. [Citation.] The evidence of inculpatory participation need not be direct nor extend to every fact and detail. It may be circumstantial and is sufficient, even though slight, if it tends to connect the defendant with the commission of the crime." (*People* v. *Henderson,* 34 Cal. 2d 340, 342-343 [209 P.2d 785].) ■■■ Defendant's submission of the bill was established, not by DuBois, but by Aetna's claims representative, Crozier, and the attorney, Dunleavy. DuBois' testimony as to the existence of the practice of making fraudulent bills and as to defendant's knowledge of and participation in that practice at the time this bill was made demonstrated defendant's guilty knowledge and intent. This testimony was corroborated by the very similar testimony of Von Berg and Moran as to defendant's connection with their billing practices when they were employed by Dr. DeLong.

The judgment is affirmed.

Stephens, Acting P. J., and Aiso, J., concurred.

A petition for a rehearing was denied June 25, 1971, and appellant's petition for a hearing by the Supreme Court was denied July 21, 1971. Wright, C. J., did not participate therein.