[No. A112744. First Dist., Div. Three. July 24, 2007.]

THE PEOPLE, Plaintiff and Respondent, v.
ANITA BEATRIZ BLICK, Defendant and Appellant.

**COUNSEL**

J. Courtney Shevelson for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette and Gerald A. Engler, Assistant Attorneys General, Seth K. Schalit and Catherine A. McBrien, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**PARRILLI, J.**—In this case we hold that Penal Code section 550, subdivision (b)(3) (section 550(b)(3)) is a specific intent crime. Defendant Anita Beatriz Blick appeals the judgment and sentence imposed following her jury trial conviction premised on this section.[1] Blick contends: (1) she was denied due process of law by the trial court's section 550(b)(3) instruction, which allegedly described that count as a strict liability offense not requiring proof of a culpable mental state; (2) the trial court erred by failing to instruct sua sponte on mistake of fact as a defense on the section 550(b)(3) count. We vacate the judgment and remand.

## FACTUAL AND PROCEDURAL BACKGROUND

A. *Medical History and Treatment*

In January 1994, Blick fell during her shift as a police dispatcher for the Town of Atherton. She injured her knee and strained her calf muscles. Blick visited Dr. Stephen Conrad, an orthopedic surgeon and her treating physician from 1994–2002, reporting pain in her right knee and episodes in which the knee buckled, causing her to fall. On July 14, 1994, Dr. Conrad performed arthroscopic surgery in an attempt to stabilize the knee and indicated Blick should remain off work because modified duty was unavailable. Blick went back to work in November 1994, but left again after only three days. She told Dr. Conrad she could not do her job because she experienced too much knee pain rising from her chair repeatedly throughout the day. Blick continued to report knee pain and buckling episodes, so Dr. Conrad carried out a second surgery in February 1995 to realign the kneecap. On April 11, 1995, Blick told Dr. Conrad she could not begin physical therapy sessions due to transportation problems, so Dr. Conrad agreed she should continue exercising at home.

Blick returned to full-time work around July 10, 1995, under modified conditions and reported no problems when she saw Dr. Conrad in September 1995. Blick next saw Dr. Conrad on October 18, 1995, and reported two episodes of her knee giving way and continued pain in the right knee. Dr. Conrad told Blick to remain off work, and on November 14, 1995, wrote

---

[1] Further statutory references are to the Penal Code unless otherwise noted.

a report stating Blick's condition was "permanent and stationary," meaning her condition was not improving and not expected to improve. Dr. Conrad's report indicated Blick was unable to continue her job as a dispatcher and recommended vocational rehabilitation.

In March 1996, Dr. Conrad received a letter from Cities Group, the Town of Atherton's worker's compensation benefits provider, stating the town would provide modified working conditions in order to allow a return to work. At Blick's request, Dr. Conrad wrote back to the Cities Group stating she could not return to work even under modified conditions because she was unable to drive or use public transportation.

On April 3, 1996, Blick saw Dr. Baciocco because Dr. Conrad was on vacation. Dr. Conrad subsequently learned Blick had returned to work on March 27, 1996, but had suffered another fall on April 1. Blick was kept off work and Dr. Baciocco's note indicated Blick was presently walking with the aid of crutches.[2] On April 10, 1996, Blick visited Dr. Conrad with a letter from her attorney requesting a statement Blick was unable to drive or use public transportation. Dr. Conrad provided the statement because he believed Blick when she said she could not drive or use public transportation. According to Dr. Conrad's notes, Blick continued to experience knee pain and use crutches in May and June of 1996.

Blick returned to work again under modified conditions on July 22, 1996. On July 24, Blick told Dr. Baciocco prolonged sitting caused pain and swelling in the knee and she did not feel she could return to work. On September 4, 1996, Dr. Conrad wrote to the Cities Group stating Blick continued to experience considerable discomfort in the knee, a return to work under even modified conditions was contraindicated, and Blick was considered totally and permanently disabled.

When Dr. Conrad saw Blick in December 1996, she reported the pain in the knee had become worse and she was still using crutches. In March 1997, she reported she was using crutches when outdoors and a cane indoors. In September 1997, he provided an assessment of Blick's disability to the Cities Group. His assessment of total disability was based on Blick's preclusion from prolonged standing or walking and her necessary use of crutches.

---

[2] Blick used Canadian Crutches, a type of crutch with a handle and a device which partially encloses the forearm.

In subsequent visits to Dr. Conrad in December 1997, and March and June 1998, Blick reported she had experienced episodes of her knee giving way as well as persistent knee pain. Also she continued to use crutches and maintain her swimming program. During visits to Dr. Conrad in September 1998, December 1998, March 1999, and May 1999, Blick reported the knee remained painful and periodically buckled under her, and that she continued to use crutches.

In August 1999, Blick reported a slight improvement, she was swimming twice a day, and had started using a cane rather than two crutches, but the knee still occasionally gave way. In November 1999, Blick reported ongoing knee pain, the knee had twice dislocated, she was no longer swimming, and she was walking with use of crutches. In March 2000, Blick's knee pain persisted, she continued to walk with crutches, and Dr. Conrad noted she remains "permanent and stationary," meaning her ability to function at work had not changed. In June 2000, Blick's knee remained painful, she continued to use a cane or crutch, but informed Dr. Conrad she had purchased an uplift device to assist her in rising from a seated position. Dr. Conrad indicated in his notes her worker's compensation case was close to resolution and it may be possible for Blick to return to some form of modified duty. As of June 2000, it was Dr. Conrad's understanding Blick was using a cane or a crutch all the time she was moving around outdoors and he thought her level of disability was the same as it had been in 1997.

Dr. Conrad next saw Blick on March 7, 2001. Blick indicated she had improved but still experienced persistent right knee pain. She was beginning to walk without the continual use of crutches but had experienced one episode of falling. Dr. Conrad noted Blick was becoming less dependent on assistive devices, but was still under the impression Blick was using crutches the majority of the time. In March 2001, Dr. Conrad was also under the impression Blick could not drive and noted her husband had driven her to the appointment.

B. *The Surveillance Tapes*

The Cities Group hired private investigators to secretly videotape Blick engaging in various activities. Blick was placed under videotaped surveillance on December 26, 2000, February 1, 2001, March 7, 2001, and November 15, 2001. The videotapes were received in evidence and viewed by the jury.

The December 2000 tape shows Blick placing small rocks along a pathway. Blick is shown stooping and bending over at the waist, with her knees bent. At times she goes down on one knee. The February 2001 video shows Blick driving her truck. The March 2001 tape shows Blick working in her garden for over two hours. Blick is shown walking up and down slopes without the use of a cane or crutches while carrying out a variety of tasks. She is seen stooping, digging with the use of her upper body, lifting bags of potting soil, watering, raking and sweeping. She is seen driving off in her truck around noon. Later that same day, she is shown in the medical building on her way to see Dr. Conrad, walking with the use of crutches. Blick is shown walking with the assistance of crutches as she leaves the building.

## C.   Criminal Proceedings

An amended information filed on March 24, 2005,[3] charged Blick as follows: count 1—making a knowingly false or fraudulent material statement or representation for the purpose of obtaining compensation, in violation of Insurance Code section 1871.4, subdivision (a)(1); count 2—grand theft, in violation of Penal Code section 487, subdivision (a); count 3—concealing or knowingly failing to disclose the occurrence of an event affecting the continued right to receive an insurance benefit, in violation of section 550(b)(3). The Town of Atherton through the Cities Group claimed total losses of $247,000, including the cost of the investigative process and attorney fees.

Trial began with opening statements on September 14, 2005, and closing arguments were delivered on October 4, 2005. At trial, Blick testified she never lied to Dr. Conrad, never misstated her condition, exaggerated her pain, or told him she could not do something unless she really believed she could not do it. She also testified she never hid her gardening activities from Dr. Conrad or any other physician. Further, Blick testified she only failed to disclose to Dr. Conrad on March 7, 2001, that she was driving again because the issue never came up and she did not think it important and not because she was trying to hide that from him. Blick stated she had no intent to obtain any more benefits than those to which she was entitled, and denied concealing or failing to disclose the occurrence of any event she believed would affect her entitlement to insurance benefits. Several witnesses gave corroborating testimony concerning Blick's knee pain and use of assistive devices, as

---

[3] The complaint was originally filed on December 17, 2003.

well as evidence of Blick's reputation for honesty. Dr. Conrad, however, testified that after viewing the surveillance tapes he "was no longer able to back her on her assertion that she was unable to work."

On October 7, 2005, the jury returned not guilty verdicts on counts 1 and 2, and a verdict of guilty on count 3, concealing or failing to disclose an event that affects entitlement to benefits. On January 6, 2006, the trial court sentenced Blick to a period of five years' supervised probation with various conditions, including 90 days in county jail. Blick filed a timely notice of appeal.

## DISCUSSION

### A. *Trial Court's Section 550(b)(3) Instruction*

Section 550(b)(3) states in pertinent part: "It is unlawful to . . . [¶] . . . [¶] . . . [c]onceal, or knowingly fail to disclose the occurrence of, an event that affects any person's initial or continued right or entitlement to any insurance benefit or payment, or the amount of any benefit or payment to which the person is entitled." (§ 550(b)(3).) The trial court instructed the jury on this offense as follows: "The defendant is accused in Count Three of having violated section 550(b)(3) of the Penal Code. [¶] Every person who, *with the specific intent to do so*, conceals or knowingly fails to disclose the occurrence of an event that affects any person's initial or continued right or entitlement to any insurance benefit or payment or the amount of any benefit or payment to which the person is entitled is guilty of a violation of section 550(b)(3) of the Penal Code. [¶] In order to prove this crime, each of the following elements must be proved: [¶] A person, *with the specific intent to do so*, concealed or knowingly failed to disclose the occurrence of an event that affects any person's initial or continued right or entitlement to any insurance benefit or payment or the amount of any benefit or payment to which the person is entitled." (Italics added.)[4]

According to Blick, the trial court's instruction construed section 550(b)(3) as a strict liability offense which did not require a "specific intent to defraud, or . . . an intent or purpose of affecting any insurance benefit, or . . . knowledge that the event would or . . . could affect benefits." Blick asserts section 550(b)(3) is not a strict liability offense. Therefore, according to

---

[4] As we describe more fully below, the italicized specific intent language was added by the trial court during its reading of the instructions to the jury.

Blick, the trial court's section 550(b)(3) instruction violated her right to due process because it failed to tell the jurors they had to find a culpable mental state before they could convict her of the offense. Specifically, Blick contends the mental state required for a section 550(b)(3) offense is the "intent to defraud." The trial court's failure to include this element in the section 550(b)(3) instruction, Blick continues, deprived her of a "good faith belief" defense to the charge, meaning the jury could convict her by finding she "intentionally conceal[ed] or fail[ed] to disclose something that turned out to affect her worker's compensation even if the concealment was done in the innocent belief that what she did not disclose . . . was irrelevant to her worker's compensation status." Blick also asserts the alleged error was prejudicial. Before addressing these contentions in detail, we first review key events during the jury instruction conference and reading of the instructions.

### (i)

Before trial, Blick submitted points and authorities in support of her special jury instructions. Special jury instruction No. 2 stated: "It is a defense to the allegation of intent to defraud that the accused acted in the good faith belief that his or her representations were true." Blick argued special instruction No. 2 "applies as written to Count 1 as well as Count 2." Blick did not argue special instruction No. 2 applied to count 3 (the section 550(b)(3) offense).

After both sides had rested at trial, the trial court conferred with counsel to settle jury instructions. The trial court stated: "The way I have found it successful to do this is to go off the record while I'm reading through them, and we can go back on the record any time you want to make any arguments . . . ." No argument was received on CALJIC No. 3.31 (Concurrence of Act and Specific Intent), which the trial court gave in the modified form requested by both parties. As given, CALJIC No. 3.31 read: "In the crimes charged in Counts One, Two and Three there must exist a union or joint operation of act or conduct and a certain specific intent in the mind of the perpetrator. Unless this specific intent exists the crime to which it relates is not committed. The specific intent required is included in the definitions of the crimes set forth elsewhere in these instructions." CALJIC No. 15.26 (Intent to Defraud—Defined) was given at the People's request, over defense objection, modified as follows: "An intent to defraud is an intent to deceive another person for the purpose of gaining some material advantage over that person or to induce that person to part with money or to alter the person's position to its injury and to accomplish that purpose by some false statement, false representation of fact, wrongful concealment or suppression of truth, or by any other artifice or act designed to deceive." Also, the parties discussed Blick's special instruction No. 2 as follows:

"Court: Okay. I will give that. [¶] And for purposes of having it typed downstairs, I will strike the defendant's Special Instruction No. 2, take out the brackets of the title. I'll just make it 'her representations.' Is that all right? [¶] Silence, stony silence. I will take that as a yes. [¶] Requested by the defendant. Objection by the People. Given as modified. [¶] . . . [¶]

"Prosecutor: Your Honor, could I get a clarification on defense Special Instruction No. 2, the defense to the intent to defraud. Can I get a clarification as to whether that applies simply to Counts One and Two, which has [*sic*] the wording 'intent to defraud' within them, as opposed to Count Three, which does not?

"Defense: I think the brief—it says it goes to Counts One and Two.

"Prosecutor: Can we add that—

"Court: We might say this is a defense to an allegation of intent to defraud.

"Defense: And the Insurance Code.

"Court: I'm sorry[?]

"Defense: I think Count Two is the Insurance Code.

"Prosecutor: Count One is the Insurance Code; Count Two is the grand theft.

"Defense: So it applies to Counts One and Two.

"Prosecutor: Can we say: In Counts One and Two, comma, it is a defense?

"Court: Yes, that's fine."

Subsequently, the following colloquy took place as the trial court was reading the section 550(b)(3) instruction to the jury after closing arguments:

"Court: In order to prove this crime, each of the following elements must be proved: [¶] One. A person concealed or knowingly failed to disclose the occurrence of an event that affects any person's initial or continued right or entitlement to any insurance benefit or payment or the amount of any benefit or payment to which the person is entitled. [¶] We're missing something here.

"Prosecutor: No.

"Court: Where is the specific intent?

"Prosecutor: It's not specific intent.

"Court: I beg your pardon?

"Prosecutor: It's not specific.

"Court: You told us—well, it has to be. We'll take a short recess . . . [jury exits]. What's the specific intent supposed to be? [¶] . . . [¶]

"Prosecutor: The act of concealing or knowingly fail to disclose. That's the intent. [¶] . . . [¶]

"Court: Wait a minute. How about this though? [¶] Every person who, with the specific intent to do so, . . . conceals or knowingly fails to disclose.

"Defense: Yes. That works.

"Prosecutor: That's fine.

"Court: You understand why we have to do this? Because earlier we told them it was going to be defined.[5] Ultimately we had to have the statement made somewhere.

"Prosecutor: I understand that.

"Defense: So it's going to read how, Judge?

"Court: Okay. Every person who, with the specific intent to do so, conceals or knowingly fails. In other words, we're just inserting 'who with the specific intent to do so.' [¶] Okay?

"Defense: Yes.

"Prosecutor: Yes."

### (ii)

■ Blick's contention the trial court's section 550(b)(3) instruction described a strict liability offense is simply wrong. The trial court clearly

---

[5] Patently, the trial court was referring back to CALJIC 3.31 which, as noted above, was given as to all three counts.

understood that specific intent was required and went to great effort to define a mental state for the offense. Strict liability offenses, otherwise termed public welfare offenses, are generally "regulatory offenses, not common law crimes[,] . . . [are] classified as 'malum prohibitum' rather than 'malum in se,' [and] are punishable despite the absence of criminal intent in any of the accepted senses." (1 Witkin & Epstein, Cal. Criminal Law (3d ed. 2000) Elements, § 17, p. 220; see *People v. Rubalcava* (2000) 23 Cal.4th 322, 331 [96 Cal.Rptr.2d 735, 1 P.3d 52] (*Rubalcava*) [strict liability offenses completely eliminate " 'the requirement of a "guilty mind" with respect to an element of a crime' " but in general intent crime "guilty mind" is shown by defendant's knowing and intentional participation in the proscribed act].) Thus, strict liability offenses include " 'illegal sales of intoxicating liquor, . . . sales of impure or adulterated food or drugs, . . . sales of misbranded articles, . . . violations of traffic regulations, and . . . violations of general police regulations, . . . passed for the safety, health or well-being of the community.' " (1 Witkin & Epstein, Cal. Criminal Law, *supra*, Elements, § 17, at pp. 221–222.) Section 550(b)(3) is not such a regulatory offense. Additionally, "[t]he prevailing trend in the law is against imposing criminal liability without proof of some mental state where the statute does not evidence the Legislature's intent to impose strict liability. [Citations]." (*In re Jennings* (2004) 34 Cal.4th 254, 267 [17 Cal.Rptr.3d 645, 95 P.3d 906] [nonetheless concluding at p. 268 that statute prohibiting sale of alcoholic beverages to minors is a strict liability offense].)

■ Here, the record shows there was some confusion about whether the intent required for the section 550(b)(3) offense was general or specific. Our Supreme Court has described the difference between general and specific intent crimes as follows: " 'When the definition of a crime consists of only the description of a particular act, without reference to intent to do a further act or achieve a future consequence, we ask whether the defendant intended to do the proscribed act. This intention is deemed to be a general criminal intent. When the definition refers to defendant's intent to do some further act or achieve some additional consequence, the crime is deemed to be one of specific intent.' [Citation.]" (*Rubalcava, supra,* 23 Cal.4th at p. 328.) In *Rubalcava*, the court held the unlawful carrying of a concealed dirk or dagger under section 12020, subdivision (a), does not have a specific intent requirement. (23 Cal.4th at p. 325.) In so holding, the court concluded "the relevant language of section 12020 is unambiguous and establishes that carrying a concealed dirk or dagger does not require an intent to *use* the concealed instrument as a stabbing weapon." (*Id.* at p. 328, italics added.) Use of the instrument would have been a "further act . . . or . . . additional consequence" contemplated by the possessor but not called for under the statute—therefore the court deemed the crime one of general, not specific, intent. (*Ibid.*) In contrast to the statute at issue in *Rubalcava,* section 550(b)(3) *does* impliedly

contemplate a future act—the obtaining of benefits to which the applicant is not entitled—thus it is a specific intent crime.

The trial court justifiably was confused by the prosecution's position that the crime was one of general intent, because the prosecution had agreed that CALJIC No. 3.31 (specific intent instruction) applied to all three counts. While reading the instructions to the jury, the trial court realized the section 550(b)(3) instruction did not define the specific intent required to complete the offense. At that point, the prosecutor tried to assert that section 550(b)(3) offense was a general intent crime. After the jury was excused, the trial court resolved the issue by instructing that the specific intent required was the specific intent to conceal or knowingly fail to disclose the occurrence of an event affecting the right to insurance benefits. However, the trial court's instruction merely adds specific intent language to the proscribed act—that of concealing or knowingly failing to disclose an event affecting insurance benefits thus precluding the criminalization of an inadvertent or accidental nondisclosure or concealment. The court defined a specific intent for the crime, but it was not the correct specific intent.[6]

Blick contends the jury should have been instructed the "further act" or "additional consequence" required to commit the section 550(b)(3) offense is an "intent to defraud." The Attorney General, on the other hand, asserts the jury was not required to find the intent to defraud because a section 550(b)(3) offense is a general intent crime for which no specific intent is required. The parties cite no precedent, nor have we found any, specifically holding what criminal intent is required for a violation of this section. Therefore, we must resolve whether section 550(b)(3) describes a general or a specific intent crime.

When construing a statute, "the language of [the] statute is generally the most reliable indicator of the Legislature's intent." (*People v. Hudson* (2006) 38 Cal.4th 1002, 1009 [44 Cal.Rptr.3d 632, 136 P.3d 168].) Accordingly, "we look first to the words of the statute, giving them their ordinary meaning and construing them in context. If the language is unambiguous, we presume the Legislature meant what it said, and the plain meaning of the statute controls. [Citations.]" (*Ibid.*) However, "if the statutory language permits more than one reasonable interpretation, courts may consider various

---

[6] We need not consider here whether the jury, even though misinstructed, had to have found a specific intent to defraud based on the way the case was presented to it. In different circumstances, one could argue that by finding that a person specifically intended to conceal information from an insurer, one specifically intended to obtain benefits fraudulently. (*People v. Dieguez* (2001) 89 Cal.App.4th 266, 279 [107 Cal.Rptr.2d 160] [noting courts have held " 'the intent to defraud the insurer is necessarily implied when the misrepresentation is material and the insured wilfully makes it with knowledge of its falsity.' [Citation.]"].) However, as we discuss in part (iii) *post*, that argument cannot be made in this case.

extrinsic aids, including the purpose of the statute, the evils to be remedied, the legislative history, public policy, and the statutory scheme encompassing the statute. [Citation.] In the end, we ' "must select the construction that comports most closely with the apparent intent of the Legislature, with a view to promoting rather than defeating the general purpose of the statute, and avoid an interpretation that would lead to absurd consequences." [Citation.]' [Citation.]" (*Torres v. Parkhouse Tire Service, Inc.* (2001) 26 Cal.4th 995, 1003 [111 Cal.Rptr.2d 564, 30 P.3d 57].)

The Attorney General, quoting *Rubalcava, supra*, 23 Cal.4th at page 328, asserts that on its face section 550(b)(3) describes a general intent crime because "it merely requires that the defendant do the prescribed act, but does not have any requirement that the defendant intend to 'achieve some additional consequence.' " However, that interpretation of the statute fails to recognize the aim of the section: to criminalize acts that attempt to defraud insurers. It also fails to consider section 550(b)(3) in the context of section 550 as a whole. (Cf. *People v. Allen* (1993) 20 Cal.App.4th 846, 851 [25 Cal.Rptr.2d 26] [construing phrase " 'as a whole; as an integral part of the whole code section . . . ; and in relation to other statutes on the same subject, so as to harmonize the whole law' "].)

We conclude that to violate section 550(b)(3) a person, in addition to concealing or knowingly failing to disclose, must intend to obtain benefits to which he or she would not be entitled if they had made the disclosure. In short, the person must intend to commit a fraud. (*People v. Counts* (1995) 31 Cal.App.4th 785, 789 [37 Cal.Rptr.2d 425] [fraud is the inducement of a party to part with property by reason of false pretenses and representations]; *People v. Booth* (1996) 48 Cal.App.4th 1247, 1253 [56 Cal.Rptr.2d 202] [element of specific intent to defraud "is more rigorous than the concept of 'knowingly' and includes the latter"—it means " 'an intent to deceive another person or to induce that person to part with property or to alter that person's position to [its] injury or risk, and to accomplish that purpose by some false statement, false representation of fact, wrongful concealment or suppression of truth, or by any other artifice or act designed to deceive' " (italics omitted)].) Earlier cases have held that an "essential element" of the fraud offenses described in section 550 is an "intention to defraud." (*People v. Scofield* (1971) 17 Cal.App.3d 1018, 1025–1026 [95 Cal.Rptr. 405] (*Scofield*); see *People v. Benson* (1962) 206 Cal.App.2d 519, 529 [23 Cal.Rptr. 908] (*Benson*), overruled on other grounds in *People v. Perez* (1965) 62 Cal.2d 769, 776 [44 Cal.Rptr. 326, 401 P.2d 934].)[7] The clear import of section 550

---

[7] Both *Scofield* and *Benson* referred to Insurance Code section 556, which provided: "(a) It is unlawful to: [¶] (1) Knowingly present or cause to be presented any false or fraudulent claim for the payment of a loss, including payment of a loss under a contract of insurance. [¶] (2) Knowingly present multiple claims for the same loss or injury, including presentation of

is to criminalize the making of false or fraudulent claims the ultimate objective of which is to obtain benefits to which the offender is not entitled. (§ 550, subd. (a)(1) [knowingly presenting "any false or fraudulent claim for the payment of a loss or injury"], (a)(2) [knowingly presenting multiple claims for the same loss or injury "with an intent to defraud"], (a)(3) [knowingly causing a vehicle accident "for the purpose of presenting any false or fraudulent claim"], (a)(8) [knowingly presenting multiple claims for payment of the same health care benefit "with an intent to defraud"].) Furthermore, when section 550 is considered as a whole, we note subdivision (c)(3) sets forth the penalty for a violation of subdivision (b)(3): subdivision (c)(3) provides that violation of subdivision (b)(3) is a felony punishable by two, three, or five years in state prison, and that the fine for any violation may be up to $50,000 or "double the amount of the *fraud*" whichever is greater. (*Ibid.*, italics added.) In short, fraud is integral to the offense.

■ Furthermore, as this court noted in an earlier case, the law imputes the intent to defraud in section 550. (*People v. Dieguez* (2001) 89 Cal.App.4th 266, 279 [107 Cal.Rptr.2d 160] ["A specific intent to defraud may be an implied element in a criminal statute making unlawful certain false or fraudulent claims, where the statute in question omits any other element of intent."].) In *Dieguez*, the appellant contended his conviction under Insurance Code section 1871.4, subdivision (a)(1) should be reversed because, in addition to the statute's requirement a fraudulent statement be made with the specific intent to obtain workers' compensation benefits, the trial court should have instructed sua sponte that a *specific intent to defraud* was required for the offense. (*People v. Dieguez, supra*, 89 Cal.App.4th at p. 276.) We rejected this contention. We noted "the language of section 1871.4, subdivision (a)(1) is clear and unambiguous, [so] there is no need to insert a superfluous additional specific intent requirement." (*Id.* at p. 279.) Moreover, we noted "intent to defraud is actually 'built into' the language of the instruction given by the trial court" because "a jury *necessarily* finds an intent to defraud" when it determines a defendant "specifically intended to obtain workers'

multiple claims to more than one insurer, with an intent to defraud. [¶] (3) Knowingly cause or participate in a vehicular collision, or any other vehicular accident, for the purpose of presenting any false or fraudulent claim. [¶] (4) Knowingly prepare, make, or subscribe any writing, with intent to present or use the same, or to allow it to be presented in support of any such claim." (Stats. 1988, ch. 1609, § 1, p. 5864.) Insurance Code section 556 was repealed in 1989 and its provisions transferred to Penal Code section 550, subdivision (a). (See Historical and Statutory Notes, 42 West's Cal. Ins. Code Ann. (2005 ed.) foll. § 556.) Penal Code section 550, subdivision (b) became operative on July 1, 1995. (Stats. 1994, ch. 1008, § 3, p. 5969.) On the latter addition, the Legislative Counsel's Digest states: "(2) Existing law makes it unlawful to knowingly do specified acts relating to insurance claims. [¶] This bill would specify additional acts which would be a violation of the above provision." (Legis. Counsel's Dig., Sen. Bill No. 1833 (1993–1994 Reg. Sess.) 4 Stats. 1994 Summary Dig., p. 408.) Thus, there is no indication the Legislature intended to alter the criminal intent required for the offense from specific intent to general intent.

compensation by means of knowingly making false or fraudulent material statements." (*Id.* at pp. 279–280.) In other words, there was no error for failure to instruct on specific intent to defraud when the specific intent required for the offense was actually spelled out in the statute and instruction. Here, in contrast to Insurance Code section 1871.4, subdivision (a)(1), the language of section 550(b)(3) is not "clear and unambiguous" on the issue of intent when viewed in the context of section 550 as a whole, nor does it contain a "built in" specific intent requirement. Thus, as *Dieguez* noted, specific intent to defraud is imputed in section 550 "where the statute . . . omits any other element of intent." (89 Cal.App.4th at 279.) Additionally, the CALJIC jury instructions note with respect to section 550, subdivision (a), that only subdivision (a)(2) references an intent to defraud and a specific intent to defraud is not specifically included in the wording of other subsections. Despite this, CALJIC recognizes "numerous cases have held that the predecessor crimes [under Insurance Code section 556] now incorporated into Penal Code § 550, required proof of a specific intent to defraud" and therefore includes specific intent to defraud for all section 550, subdivision (a) offenses. (See CALJIC No. 15.40, Fraudulent Insurance Claims, Use Note; CALJIC No. 15.41.3, Fraudulent Health Care Insurance Claims, Comment; see also Judicial Council of Cal. Crim. Jury Instns. (2006–2007) Bench Notes to CALCRIM No. 2000, p. 95 [stating court has a duty to instruct sua sponte to instruct on elements of a § 550 offense, including the intent to defraud].)

The Attorney General argues that the Legislature's failure to include specific intent language in section 550(b)(3) indicates the Legislature did not intend to impose such a requirement. As noted above, however, such an interpretation is unreasonable when subdivision (b)(3) is read in the context of section 550 as a whole. (*People v. Hudson, supra,* 38 Cal.4th at p. 1009 [statutory language must be construed in context].) Here, the penalty section 550, subdivision (c)(3) specifically references is fraud, so at best, subdivision (b)(3) is ambiguous with respect to its intent requirement, permitting our construction. (*Torres v. Parkhouse Tire Service, Inc., supra,* 26 Cal.4th at p. 1003 [if statutory language is ambiguous "courts may consider various extrinsic aids, including the purpose of the statute, the evils to be remedied, the legislative history, public policy, and the statutory scheme encompassing the statute"].) Our interpretation is faithful to the purpose of the statute and the evil which it seeks to remedy—to criminalize and punish the making of false or fraudulent claims to obtain benefits. Also, imputing a specific intent to defraud avoids absurd results, whereas under the Attorney General's argument, any intentional concealment or knowing failure to disclose amounts to a violation of subdivision (b)(3) if it affects benefits, even if disclosure would have *increased* benefits. (*Torres,* at p. 1003 [courts must avoid a statutory interpretation " ' "that would lead to absurd consequences" ' "].) Accordingly, we conclude section 550(b)(3) requires a specific intent to defraud. Therefore,

the section 550(b)(3) instruction was erroneous, and we now consider whether the error was prejudicial.[8]

#### (iii)

We determine the prejudicial effect of instructional error under the *Watson*[9] standard by asking whether a reasonable probability exists the outcome would have been different but for the error. (*People v. Flood, supra,* 18 Cal.4th at p. 489 .) Such a reasonable probability exists here. The trial court instructed the jury, as to counts 1 and 2 only, that "[i]t is a defense of an allegation of intent to defraud that the accused acted in the good faith belief that her representations were true." Because an intent to defraud was not included within the elements of count 3, the section 550(b)(3) offense, the good-faith-defense instruction was not given as to this count. The prosecutor strenuously argued and emphasized this distinction in closing argument: "[I]ntent to defraud is charged—is part of Counts One and Two; and under intent to defraud, there has to be an intent to deceive for an advantage, to get money. . . . [¶] And there is a defense to Counts One and Two only in that if the defendant acted in good faith. Then that's a defense to intent to defraud and, again, that applies only to Counts One and Two. . . ." The prosecutor continued: "[A]nd then finally in Count Three, she's charged with the fact of concealing or knowingly failed to disclose, okay, the occurrence of an event that affects any person's initial or continued right to any insurance benefit. . . . [¶] *This count does not have the specific intent to defraud, nor does it have the defense of a good faith belief.* This count is specifically just: Did you conceal or knowingly fail to disclose?" After deliberating, the jury returned not-guilty verdicts on counts 1 and 2—for which the good-faith-belief defense was available—and returned a guilty verdict only on count 3, which required no specific intent to defraud and to which the good-faith-defense was *not* available. Under these circumstances, there is a reasonable probability the instructional error affected the jury's verdict.[10]

---

[8] We may review instructional error, even in the absence of an objection, where the substantial rights of the accused are affected. (*People v. Flood* (1998) 18 Cal.4th 470, 482, fn. 7 [76 Cal.Rptr.2d 180, 957 P.2d 869], criticized on another ground in *People v. McCall* (2004) 32 Cal.4th 175, 187, fn. 14 [8 Cal.Rptr.3d 337, 82 P.3d 351]; *People v. Andersen* (1994) 26 Cal.App.4th 1241, 1249 [32 Cal.Rptr.2d 442].) We could view the instructional error in this case as invited error (*ante,* at pp. 768–769). However, because the court has a sua sponte duty to instruct accurately on the elements of an offense (*People v. Cummings* (1993) 4 Cal.4th 1233, 1311 [18 Cal.Rptr.2d 796, 850 P.2d 1]), we address the error in this appeal.

[9] *People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].

[10] Because we conclude the instructional error was prejudicial, we need not address Blick's further contention the trial court erred by failing to instruct sua sponte on the defense of mistake of fact.

## DISPOSITION

The judgment is vacated and the matter remanded for further proceedings.

McGuiness, P. J., and Siggins, J., concurred.