Filed 10/16/25  P. v. Izumi CA4/1
# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D085868 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. FSB19003195) |
| YOSHI KAZAUTO IZUMI, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Bernardino County, Cheryl C. Kersey, Judge.  Reversed.

Janice R. Mazur, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Arlene A. Sevidal, Andrew Mestman, and Jon S. Tangonan, Deputy Attorneys General, for Plaintiff and Respondent.

## I. INTRODUCTION

That Yoshi Kazauto Izumi killed Michael Roberts is beyond question in this case:  A third party witness saw the fatal altercation, Izumi admitted the

killing to police officers, and testified to it during his jury trial. However, Izumi vehemently contested what kind of killing he committed. That determination depended on how the jury perceived Izumi's mental state when he killed Roberts. The People argued that Izumi acted willfully and with premeditation and deliberation. Izumi disputed this story, instead claiming that while laboring under intense emotions caused by his belief that Roberts molested Izumi's young daughter, Izumi acted from provocation and in the heat of passion.

The jury resolved this conflict by rejecting the prosecution's theory of first degree murder and instead finding Izumi guilty of second degree murder. The verdict occurred after the trial court instructed the jury it could consider two previous violent acts as evidence of Izumi's propensity to commit violence.[1] The trial court did not explain how it reached the determination to expand the use of those two prior events beyond proving motive, intent, or plan. Given the jury's verdicts reflected provocation may have played a part in the homicide, combined with the natural tendency to give propensity evidence excessive weight, we conclude it was reasonably probable Izumi would have obtained a better result absent the instructional error. We therefore reverse the conviction.

## II. BACKGROUND

Izumi and Ashley Ramirez have a minor daughter, A. In 2019, A. lived with her maternal grandmother, Kelli Vega Roberts (Vega), and her step-grandfather, Michael Roberts (Roberts).

---

[1] Character evidence is also referred to as propensity evidence "or disposition to engage in a type of conduct." (*People v. Villatoro* (2012) 54 Cal.4th 1152, 1159.)

2

On August 31, 2019, Izumi stabbed Roberts in the throat twice, killing him. The San Bernardino County District Attorney's Office charged Izumi with murder (Pen. Code, § 187, subd. (a)), alleging that he committed the offense with a deadly weapon (*id.,* § 12022, subd. (b)(1)).

Before his 2023 trial began, the People moved in limine pursuant to Evidence Code[2] section 1101, subdivision (b) (section 1101(b)) to admit two of Izumi's prior violent acts for impeachment, and to show both motive and intent. The first violent act occurred on August 4, 2013, when Izumi restrained Ramirez, hit her in the face, and threatened to kill her for wanting to leave with A. under conditions he believed were unsafe. The second occurred on September 24, 2013, when Izumi stabbed Ramirez's boyfriend, Billy Meteer, in the hand because he thought Meteer was a threat to A.[3]

The trial court granted the motion, finding the prior acts admissible for impeachment as moral crimes of moral turpitude. Further, regarding section 1101(b), the court found sufficient "similarity in the crimes to admit the evidence, and that the motive and intent and propensity to commit shows a pattern of jealousy and an abnormal reaction to events that he justifies as protection of the family unit." Based on this ruling, the trial court admitted testimony from Ramirez and Izumi describing both prior acts. Ramirez testified that in the August 2013 incident, Izumi told Ramirez she could not leave with A. while it was dark outside, and he prevented Ramirez and A. from leaving that night and through the next day. Ramirez explained how Izumi beat her and threatened to kill her for wanting to leave with A.

---

[2]     All further undesignated section references are to the Evidence Code.

[3]     Izumi was convicted of battery against the parent of his child (Pen. Code, § 243, subd. (e)(1)) for the Ramirez incident and assault with a deadly weapon (*id.*, § 245, subd. (a)(1)) for the Meteer incident.

3

Regarding the Meteer incident, Izumi testified that "[i]t was about protecting my daughter from the situation she was in."

The trial court also admitted testimony from a responding officer and a recording of police interviewing Izumi regarding the Meteer incident. In that interview, Izumi stated he had no lapse in judgment when he stabbed Meteer and that he "prayed on" it beforehand. When asked about the August 2013 domestic violence incident with Ramirez, Izumi stated it happened because Ramirez "was all doped up" and trying to leave with A.

When Izumi testified at trial, he admitted killing Roberts, arguing that he acted in the heat of passion. Izumi stated that about one week before the killing, Ramirez told him that Roberts was molesting A. Izumi did not completely believe Ramirez, so he went to the Roberts' home on August 31, 2019, to ask A. about it. According to Izumi, he questioned A. approximately an hour and a half to two hours after his arrival, at which point he became convinced that Roberts molested her. Izumi testified that he did not know what to think, feeling confused, angry, hopeless, and helpless. Approximately a minute or two later, Izumi approached Roberts, shouted "you raped my daughter," and stabbed Roberts with a pocketknife that he always carries with him. Izumi denied any prior intention of harming Roberts, claiming he had no problems with Roberts during the last 10 years, and that he was not in his "right mind" during the killing.

Michael Larson, Roberts's friend, also testified. He said that he, Roberts, and Izumi were talking outside by the garage before the killing. Larson did not hear any arguments, and Izumi did not appear to be upset. A. was home, running in and out of the house, but Larson never saw her speak with Izumi. After Larson went inside the Roberts' home to get another beer,

4

he returned to find Izumi holding Roberts in a headlock with blood everywhere.

Vega testified as well, explaining that there were no prior conflicts between Roberts and Izumi. She left the house shortly before the killing, at which point Roberts and Izumi were talking amicably in the driveway, there did not appear to be any tension between them, and their moods were friendly. A. was running in and out of the house, and Vega saw A. talking with Izumi.

During her trial testimony, Ramirez denied telling Izumi that Roberts was molesting A. The parties stipulated that the police interviewed A. and determined that the allegations of Roberts's sexual abuse were unfounded. The prosecutor also showed the jury footage from a neighbor's surveillance camera. It captured Izumi's car arriving at the Roberts' residence, and then about an hour later Izumi stating "you raped my daughter." The footage does not clearly depict any interactions between Izumi and Roberts, or Izumi and A., due to obstructions and distance between the neighbor's camera and the Roberts' residence.

At a jury instruction conference with the parties, the trial court stated CACLRIM No. "375 will be given based on the prior stabbing incident and domestic violence." The parties did not object to or otherwise comment on CALCRIM No. 375. The trial court proceeded to instruct the jury with a modified version of CALCRIM No. 375 as follows:

5

The People presented evidence that the defendant committed other offenses[4] of violence that were not charged in this case.

You may consider this evidence only if the People have proved by a preponderance of the evidence that the defendant in fact committed the uncharged offenses. Proof by a preponderance of the evidence is a different burden of proof than proof beyond a reasonable doubt. A fact is proved by a preponderance of the evidence if you conclude that it is more likely than not that the fact is true.

If the People have not met this burden, you must disregard this evidence entirely.

If you decide that the defendant committed the uncharged offenses, you may, but are not required to, consider that evidence for the limited purpose of deciding whether:

The defendant acted with the intent to murder Michael Lynn Roberts; or

The defendant had a motive to commit the offense alleged in this case; or

The defendant had a plan to commit the offense alleged in this case; or

*The defendant acted in conformity with this character trait.*

In evaluating this evidence, consider the similarity or lack of similarity between the uncharged offenses and the charged offense. Do not consider this evidence for any other purpose except for the limited purpose of determining

---

4    The written instructions given to the jury state "other *offenses* of violence." (Italics added.) The reporter's transcript states, "other *evidence* of violence." (Italics added.) For appellate review, the written instructions control since they went back into the jury room during deliberations. (*People v. Wilson* (2008) 44 Cal.4th 758, 803 ["To the extent a discrepancy exists between the written and oral versions of jury instructions, the written instructions provided to the jury will control."].)

the defendant's credibility *and whether the defendant acted in conformity with this character trait.*[5]

> Do not conclude from this evidence that the defendant has a bad character or is disposed to commit crime.

> If you conclude that the defendant committed the uncharged offense, that conclusion is only one factor to consider along with all the other evidence. It is not sufficient by itself to prove that the defendant is guilty of murder or that the allegation has been proved. The People must still prove each charge and allegation beyond a reasonable doubt. (Italics added.)

The trial court also instructed the jury on the following forms of homicide: willful, deliberate and premeditated first degree murder; second degree murder; and heat of passion voluntary manslaughter.[6]

The jury found Izumi guilty of second degree murder and that he personally used a deadly weapon in the commission of the offense. The trial court sentenced Izumi to 31 years to life in prison.[7] Izumi's timely appeal followed.

In his opening brief, Izumi challenged the trial court's admission of his prior acts on several grounds, including that those acts were improperly

---

[5] The written instructions given to the jury indicate that they were not modified, but the italicized language does not appear in CALCRIM No. 375. This language appears to come from CALCRIM No. 352, which instructs on admissibility of character evidence under section 1103 and is inapplicable in this case as discussed below. The record is unclear as to how this significant modification occurred.

[6] In their closing argument, the People also argued that Izumi committed lying-in-wait first degree murder, but the jury was not instructed on that theory.

[7] Izumi received 15 years to life for the murder, doubled to 30 due to a prior strike, plus one year for the deadly weapon enhancement. The trial court imposed and stayed an additional five years for a prior serious felony.

admitted to prove his propensity for violence. To evaluate that claim properly, we were required to review the jury instructions for limitations, if any, placed on how the jury could use this evidence. That examination revealed the trial court told the jury it could consider the past violent acts as evidence of Izumi's propensity to commit violence.

However, the parties did not address the trial court's character evidence instructions in their initial briefing to this court, so we asked for supplemental filings on that issue. In his supplemental briefing, Izumi claims the trial court prejudicially erred by instructing the jury that it could consider Izumi's prior acts to prove that he acted in conformity with his character. The People contend that Izumi forfeited the issue by failing to object to the instruction at trial, the trial court's instructions were a correct statement of the law, and any error was harmless because the evidence of Izumi's guilt was overwhelming. As explained below, we agree with Izumi.[8]

## III. DISCUSSION

A. *Limitations on Character Evidence and Standard of Review*

"Section 1101[, subdivision] (a) prohibits the admission of character evidence if offered to prove conduct *in conformity with that character trait*, sometimes described as a propensity to act in a certain way." (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 405–406, italics added.) " 'The reason for this rule is not that such evidence is never relevant; to the contrary, the evidence is excluded because it has too much probative value.' [Citations.] ' "The natural and inevitable tendency" ' is to give excessive

---

[8] Based on this outcome, we do not reach Izumi's claims in his opening brief that the trial court erred by admitting his prior battery against Ramirez for impeachment, excluding statements from a deceased witness, and declining to give a pinpoint instruction on provocation.

weight to the prior conduct and either allow it to bear too strongly on the present charge, or to take the proof of it as justifying a conviction irrespective of guilt of the present charge." (*People v. Hendrix* (2013) 214 Cal.App.4th 216, 238.)

Notwithstanding section 1101, subdivision (a), a defendant's prior bad acts may be admissible "when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, . . . ) other than his or her disposition to commit such an act." (§ 1101(b).) Section 1101 is subject to section 352, under which the court may exclude prior act evidence "if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

Additionally, the prosecution may use character evidence in the following very limited circumstances: to *rebut* the defendant's use of character evidence regarding the defendant or victim (§§ 1102; 1103); and when the past act and current charge are sexual offenses (§ 1108), domestic violence, elder abuse, or child abuse (§ 1109).

We review the admission of evidence for abuse of discretion. (*People v. Foster* (2010) 50 Cal.4th 1301, 1328.) Under that standard, " ' " a trial court's ruling will not be disturbed, and reversal . . . is not required, unless the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." ' " (*Id*. at pp. 1328–1329.)

We independently review claims of instructional error. (*People v. Mitchell* (2019) 7 Cal.5th 561, 579.) "We determine the prejudicial effect of

9

instructional error under the *Watson*[9] standard by asking whether a reasonable probability exists the outcome would have been different but for the error." (*People v. Blick* (2007) 153 Cal.App.4th 759, 775.) "A 'reasonable probability' 'does not mean more likely than not, but merely a *reasonable chance*, more than an *abstract possibility*.' " (*People v. Hardy* (2021) 65 Cal.App.5th 312, 329–330.)

B.      *The Trial Court Did Not Abuse Its Discretion in Admitting Izumi's Prior Crimes Under Section 1101(b) to Prove Intent*

Izumi argues his prior convictions were inadmissible under section 1101(b) because they did not tend to prove any issue material to the People's case. Regarding intent, Izumi asserts the victims in the prior incidents were not in the same category as the victim of the current offense. Izumi further contends the prior acts were inadmissible under section 352. We disagree.

" 'The least degree of similarity (between the uncharged act and the charged offense) is required in order to prove intent. . . .  In order to be admissible to prove intent, the uncharged conduct must be sufficiently similar to support the inference that the defendant " 'probably harbor[ed] the same intent in each instance.' " ' " (*People v. Foster*, *supra*, 50 Cal.4th at p. 1328.)

Izumi beat, restrained, and threatened to kill Ramirez because he did not want Ramirez to leave with A. in the dark while she was under the influence of drugs. And when Izumi stabbed Meteer, "[i]t was about protecting [his] daughter from the situation she was in." Similarly, Izumi killed Roberts because he believed Roberts was molesting A.

---

9      *People v. Watson* (1956) 46 Cal.2d 818, 836.

Contrary to Izumi's claims, all three victims were similarly situated because Izumi perceived them as a threat to his daughter and Izumi reacted against each with violence. Further, Izumi "prayed on" the Meteer incident beforehand and the Ramirez incident lasted overnight and through the following day, suggesting that the prior crimes may have involved significant planning. These prior acts are therefore relevant to the People's first degree murder theory and could support the inference that Izumi harbored the same intent in all three crimes. Accordingly, the trial court had a reasonable basis to find the prior acts sufficiently like the charged crime, and probative of intent.

Although three witnesses testified about the prior crimes and Izumi's police interview regarding the Meter incident was admitted, the trial lasted five days, with 14 witnesses and 52 exhibits in total. The prior acts also did not result in death and were less inflammatory than the current offense, reducing the risk of confusion or undue prejudice. The trial court therefore had adequate grounds to find the prior crimes' probative value was not substantially outweighed by undue consumption of time or a substantial danger of undue prejudice, confusing the issues, or misleading the jury.

In sum, we see no abuse of discretion in admitting the prior acts under section 1101(b) to prove intent.

C.    *The Trial Court Erred in Instructing the Jury on Character Evidence*

       1.    Izumi Did Not Forfeit the Issue

Although Izumi did not object to the trial court's version of CACLCRIM No. 375, "[t]he rule of forfeiture does not apply . . . if the instruction was an incorrect statement of the law [citation], or if the instructional error affected the defendant's substantial rights." (*People v. Franco* (2009) 180 Cal.App.4th 713, 719.) Both of these exceptions apply here.

11

## 2. The Trial Court Erred in Instructing the Jury

Although the trial court properly admitted Izumi's prior crimes under section 1101(b) as discussed above, we can discern no basis to admit that evidence for propensity purposes. Izumi did not offer any evidence of his own character or that of Roberts's, rendering inapplicable sections 1102 and 1103's allowance for prosecution rebuttal propensity evidence. Additionally, the trial court did not find that the charged murder constituted a sexual offense, domestic violence, elder abuse, or child abuse, so there was no basis to admit character evidence under sections 1108 and 1109.

Under these circumstances, the bar against character evidence was in effect. However, the trial court told the jury the opposite. The court twice instructed the jury that it could consider Izumi's past violent acts to determine whether he "acted in conformity with this character trait." Here, this was prejudicial error.

## 3. The Trial Court's Error Prejudiced Izumi

At the outset, we acknowledge that a portion of the trial court's character evidence instruction was correct. Specifically, the trial court instructed the jury not to conclude from the prior acts "that the defendant has a bad character or is disposed to commit crime." But this correct portion was contradicted by two incorrect portions allowing the jury to consider the uncharged acts to determine if Izumi acted in conformity with his character to commit acts of violence. Additionally, the prosecutor highlighted those two incorrect portions in closing argument when she stated that the jury could use the prior acts "to assess [Izumi's] character," and "to consider whether he acted in conformity with his character." Thus, despite the correct portion of the instruction, we doubt the jury properly applied the bar against character evidence.

12

As for the People's contention that any instructional error was harmless based on the overwhelming evidence of Izumi's guilt, we disagree. The evidence overwhelmingly established that Izumi killed Roberts, but that issue was never in dispute. Instead, the disagreement in this matter focused on Izumi's state of mind and the resulting form of homicide that occurred, and the evidence was conflicting on that subject.

Both Vega and Izumi testified that there were no prior disputes between Izumi and Roberts. Vega and Larson also testified that there did not appear to be any tension between Izumi and Roberts while they chatted before the killing. The neighbor's surveillance footage did not capture any arguments until Izumi yelled, "you raped my daughter" about an hour after he arrived at the Roberts' home and moments before he killed Roberts. This evidence is consistent with Izumi's claim that he killed Roberts in a heat of passion shortly after Izumi claimed A. confirmed Roberts's alleged abuse.

Although other evidence conflicted with Izumi's claim, such as Ramirez's denial of telling Izumi that Roberts molested A. and Larson's testimony that he never saw Izumi speaking with A., the jury rejected the prosecution's theory that this was a preplanned attack by finding Izumi not guilty of first degree murder. As such, the jury seemingly determined that the killing involved some degree of provocation. Provocation may reduce first degree murder to second degree murder. (*People v. Carasi* (2008) 44 Cal.4th 1263, 1306; CALCRIM No. 522.) Provocation is also " 'the factor which distinguishes the "heat of passion" form of voluntary manslaughter from murder.' " (*People v. Manriquez* (2005) 37 Cal.4th 547, 583.) " ' "Heat of passion arises when 'at the time of the killing, the reason of the accused was obscured or disturbed by passion to such an extent as would cause the ordinarily reasonable person of average disposition to act rashly and without

13

deliberation and reflection, and from such passion rather than from judgment.' " ' " (*Id*. at p. 584.)

The character evidence in this case detailed two prior instances where Izumi resorted to violence under the apparent belief that he was protecting his daughter. It included Izumi's statement that he had no lapse in judgment when he stabbed Meteer and that he "prayed on" it beforehand, and Ramirez's description of a prolonged domestic violence incident. From this evidence, the jury could infer not only that Izumi was a violent person, but that his past use of violence to protect his daughter was a reasoned decision. The trial court's character evidence instruction allowed the jury to conclude that Izumi acted in conformity with that character trait when he killed Roberts, and that conclusion would negate the provocation necessary for heat of passion voluntary manslaughter.

In light of the foregoing and given " ' "[t]he natural and inevitable tendency" ' . . . to give excessive weight to" propensity evidence (*People v. Hendrix, supra,* 214 Cal.App.4th at p. 238), there is a reasonable chance the jury's ability to use character evidence affected its selection of second degree murder over Izumi's heat of passion voluntary manslaughter defense. Accordingly, we conclude there is " ' " 'more than an abstract possibility' " ' [citation] that at least one juror" decided the case against Izumi using impermissible character evidence. (*People v. Hendrix* (2022) 13 Cal.5th 933, 948.) We conclude therefore the outcome would have been different in the absence of the trial court's instructional error, requiring reversal.

## IV. DISPOSITION

The judgment is reversed, and the matter is remanded for a new trial.


RUBIN, J.

WE CONCUR:


IRION, Acting P. J.


DATO, J.